**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Brandon K. MARSHALL, Appellant.**

Superior Court of Pennsylvania.

Submitted Aug. 12, 2002.

Filed May 12, 2003.

Scott A. White, Public Defender, Clarion, for appellant.

Mark T. Aaron, Asst. Dist. Atty., Clarion, for Com., appellee.

BEFORE: STEVENS, BOWES, and OLSZEWSKI, JJ.

OPINION BY STEVENS, J.:

¶ 1 Brandon Marshall, Appellant, appeals from the judgment of sentence entered after a jury convicted him of two counts of driving under the influence of alcohol (DUI).[1] Appellant challenges trial court rulings that permitted the admission of preliminary breath test evidence, and that sequestered Appellant's scientific expert. We find that the Commonwealth's repeated and extensive use of inadmissible preliminary breath test evidence prejudiced Appellant, thus entitling him to a new trial.

¶ 2 This case arises from a late night vehicular stop after Appellant temporarily lost control of his car on a snow-covered road. Officer Neil Kemmer of the Clarion Borough Police Department arrested Appellant following field sobriety tests, and transported him for a hospital-drawn blood alcohol content test (BAC), which was performed forty-two minutes after the stop. The results of Appellant's BAC test were .10%. Therefore, the Commonwealth charged Appellant with two counts of DUI and presented its case at Appellant's June 28, 2001 trial.[2]

¶ 3 Testimony at trial established that Appellant and two friends left a popular Clarion college bar just after its 2:00 a.m., Saturday morning closing. As Appellant drove west on South Street in snowy, slushy conditions, Officer Kemmer drove his cruiser approximately one block's distance behind. From that vantage point, Officer Kemmer watched the back end of Appellant's car slide out almost ninety degrees in excess of an intended ninety-degree left-hand turn. N.T. 6/28/01 at 23–25, 40–42. As a result of the slide, Appellant's car came to a stop facing east in the eastbound lane of South Street, just short of a parked car. Appellant reversed his car to correct its angle, and then proceeded up the side street before Officer Kemmer stopped him. N.T. at 42. Officer Kemmer testified that Appellant was stopped for the slide, and not for speeding or any other motor vehicle violation. N.T. at 43, 49.

¶ 4 Once stopped, Appellant rolled down his driver's side window and readily produced his driving papers. N.T. at 43–44. With the window down, Officer Kemmer noticed that Appellant smelled of alcohol and had bloodshot, watery eyes. N.T. at 44. Addressing neither of Appellant's two passengers, Officer Kemmer ordered Appellant out of the car for sobriety field tests. N.T. at 45. Appellant exited without staggering and responded at all times without slurring his speech. Id.

¶ 5 In recounting the field tests for the jury, Officer Kemmer explained that the first one he administered was the finger-to-nose test. Officer Kemmer determined that Appellant failed by prematurely starting the test and by touching above the tip of his nose. N.T. at 46. Officer Kemmer

---

1. 75 Pa.C.S.A. §§ 3731(a)(1) and (4).

2. The trial transcript mistakenly bears the date of September 5, 2001 on its cover page.

September 5, 2001 was the date of Appellant's sentencing.

testified that light snow was falling at the time of the test, and that at least one, and probably both, patrol cars at the scene had their overhead lights flashing. N.T. at 47.

¶ 6 The second field test was the heel-to-toe walk, where Appellant had to walk with heel touching toe for nine steps, turn around, and walk nine steps back to the starting point. Appellant failed this. test as well because two of his eighteen steps were an inch apart or a little off-center. N.T. at 47. Officer Kemmer could not remember if he had first cleared a path for Appellant, who was wearing sneakers that evening. N.T. at 46–47.

¶ 7 The final field test was the single leg stand, where Appellant had to raise one leg six inches off the ground and count from one-thousand one to one-thousand thirty while standing on the remaining leg. Failure usually occurs if a person loses balance or miscounts. N.T. at 49. According to Officer Kemmer, Appellant passed this test.

¶ 8 At that point in Officer Kemmer's testimony, the Commonwealth asked him if he administered any other field tests. Officer Kemmer told the jury that he also gave Appellant a portable breath test (PBT). When the Commonwealth asked Officer Kemmer to explain a PBT for the jury, defense counsel reissued an earlier objection—overruled during opening statements—that PBT evidence is inadmissible at trial. N.T. at 31. After removing the jury to allow for open discussion on the objection, the court ruled that PBT evidence was admissible to prove probable cause for Appellant's ·arrest on DUI charges. N.T. at 32.

¶ 9 The jury returned and, uninstructed on the court's ruling as to the limited purpose of PBT evidence, heard extensive discussion about the PBT given to Appellant:

**Commonwealth (Q):** Now, can you describe for the members of the jury exactly what a portable breath test device is?

**Officer Kemmer (A):** Portable breath test device is a device that is a little black box, has a hollow tube on the top. I had Mr. Marshall blow through the tube. I could feel air coming through. Once he give his breath test I stop it and it shows me a reading of what his breath test was.

**Q:** Okay. Now, does this give a figure at that time, read out, or does it give simply a reading of pass, fail?

**A:** It's a digital read out.

· · ·

**Q:** Is the PBT a calibrated or non-calibrated device?

**A:** It's a calibrated device.

**Q:** And what is a calibrated device?

**A:** It's a device that is calibrated every sixty days. It makes sure it's accurate. They test it every sixty days to make sure it's accurate.

**Q:** Much the same that radar is tested periodically to make sure that its accurate?

**A:** Yes.

**Q:** Intoxilyzers in the station, the large units, are a calibrated device?

**A:** Yes.

**Q:** So, solely to insure it's accuracy if it's going to be used?

**A:** Yes.

**Q:** The device that you used that night, was it a calibrated or non-calibrated device?

**A:** It was calibrated.

**Q:** Okay. And do you recall what the reading was on that calibrated device when it was administered to the defendant?

**A:** Point one zero.

**Q:** Point one zero?

**A:** Point one zero.

**Q:** Now, from the time you stopped the vehicle until the PBT was administered, what period of time elapsed?

**A:** . . .nine minutes.

**Q:** Within nine minutes?

**A:** Within nine minutes.

**Q:** So I understand, the PBT would have been administered before being placed into custody?

**A:** Yes.

**Q:** Now, what is the PBT used for?

**A:** Probable cause.

**Q:** Probable cause?

**A:** Yes.

**Q:** So, in other words, if an individual read point one zero that is not the end of the case right there, there's additional testing?

**A:** Yes.

. . .(**discussion regarding Appellant's blood test drawn at hospital**).

**Q:** And were you supplied with a copy of the Clarion Hospital Blood Alcohol Test Report. . .?

**A:** Yes. On December 14 I received that which showed a result of point one zero percent.

**Q:** Okay. So the blood test that you received from the hospital was in fact consistent with the PBT test in terms of alcohol reading?

**A:** Yes, it was.

**Q:** And one was breath and one was blood?

**A:** Yes, it was.

**Q:** And are those both approved methods of testing?

**A:** Yes, they are.

. . .

**Q:** When you blow into it I take it from your testimony that it starts on zero zero and then gradually climbs until it reaches what the machine reads as the then blood alcohol reading and stops at this point?

**A:** Yes.

N.T. at 32–36, 52.

¶ 10 Finally, the Commonwealth argued to the jury in closing that Appellant's relation-back expert may have been specific about Appellant's consumption and absorption of alcohol,

[b]ut the one thing that you [the jury] have to consider, the one thing that [the expert] never attacked or [had] anything to testify to was the point one zero reading on the calibrated point [sic] or PBT given by Officer Kemmer or that point one zero [hospital blood test]. . . . So when you get to the jury room consider these factors. We have an undisputed test from the hospital showing point one zero, we have a calibrated PBT not attacked by the defense showing a point one zero, we have discrepancies in [Appellant's expert's] report on the numbers. . . . . . . .So keep that in mind, and please bring back a conviction on both counts.

N.T. at 163.

¶ 11 The jury received standard instructions on the two DUI charges, but again received no corresponding limiting instruction for PBT evidence. N.T. 163–177. Moreover, included in the Section 3731(a)(4) DUI–BAC instruction was statutory language that a prima facie case may be based on "a chemical test [ ] performed on a sample of that person's breath, blood, or urine provided the sample is taken from the defendant within three hours of driving[,]" but without explanation that a PBT is not a qualifying chemical test on breath.[3] N.T. at 173.

**3.** For a discussion of the differences between a PBT and a station house Breathalyzer/Intox-

¶ 12 The jury took the case at 3:53 p.m. N.T. at 177. During its deliberations, the jury asked the court on two occasions to clarify the Section 3731(a)(1) DUI–Incapable of Safe Driving charge. At 7:00 p.m., the jury returned verdicts of guilt on both charges.

¶ 13 On September 5, 2001, the trial court set a sentence of incarceration of not less than forty-eight hours or more than two years less one day in the Clarion County Prison, with automatic parole under county supervision commencing after the completion of the forty-eight hour minimum sentence. The trial court postponed sentence pending post-sentence motions, where Appellant requested a new trial because of, *inter alia,* admission of PBT evidence. The trial court agreed that PBT evidence was in fact inadmissible, but it nevertheless found that no prejudice befell Appellant in a case of otherwise "substantial" independent evidence of guilt. The trial court denied Appellant's post-sentence motions and ordered Appellant to serve his sentence beginning on January 18, 2002. This appeal followed.

¶ 14 It is well-settled that a trial court's rulings on evidentiary questions are controlled by the discretion of the trial court, and this Court will reverse only for clear abuse of that discretion. *Commonwealth v. Keys,* 814 A.2d 1256 (Pa.Super.2002). Discretion is abused when the course pursued represents not merely an error of judgement, but where the judgement is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias, or ill will. *Id.*

¶ 15 PBT results are not admissible at trial. *Commonwealth v. Stanley,* 427 Pa.Super. 422, 629 A.2d 940 (1993); *Commonwealth v. Myrtetus,* 397 Pa.Super.

299, 580 A.2d 42 (1990). Specifically, the statute authorizing use of PBT explicitly states that "[t]he sole purpose of this [PBT] test is to assist the officer in determining whether or not the person [suspected of DUI] should be placed under arrest." 75 Pa.C.S.A. § 1547(k). To the extent that the Department of Health approves the PBT device, moreover, it is for this field screening purpose only, for PBT results are not sufficiently reliable to establish at trial the requisite elements of a DUI offense. *Id.; Commonwealth v. Allen,* 454 Pa.Super. 73, 684 A.2d 633, 634 (1996). Clearly, therefore, the trial court misapplied the law in permitting the Commonwealth to introduce PBT evidence at trial.

¶ 16 We turn, then, to whether the trial court's error was harmless. *See Stanley, supra* (conducting harmless error inquiry where PBT evidence improperly admitted). An error will be deemed harmless where the appellate court is convinced beyond a reasonable doubt that the error would not have contributed to the verdict. *Commonwealth v. Seibert,* 799 A.2d 54, 66 (Pa.Super.2002). Guidelines for determining whether an error is harmless include: (1) whether the error was prejudicial to the defendant or if prejudicial, whether the prejudice was de minimus; (2) whether the erroneously admitted evidence was merely cumulative of other, untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) whether the evidence of guilt was so overwhelming as established by properly admitted and uncontradicted evidence that the prejudicial effect was so insignificant by comparison to the verdict. *Commonwealth v. Nolen,* 535 Pa. 77, 85, 634 A.2d 192, 195 (1993).

ilyzer test, see *Wall v. Commonwealth,* 114 Pa.Cmwlth. 397, 539 A.2d 7 (1988).

¶ 17 The record here prevents confidence beyond a reasonable doubt that extensive PBT evidence did not contribute to the jury's verdict. While other evidence in the case may have been sufficient to convict Appellant on both DUI counts, it was not overwhelming.

¶ 18 On the BAC-based count, the Commonwealth's evidence was that Appellant's BAC was a threshold .10% forty-two minutes after he drove. The Commonwealth chose to stand pat on such evidence. Appellant offered rebuttal expert testimony that the time and amount of his consumption, coupled with an average absorption rate for a man of his 6′ 1″, 225 pound size, would have placed his BAC somewhere between .04 and .08 at the time he drove. N.T. at 118. On cross-examination, the Commonwealth noted that the expert's testimony varied from his preliminary written report, which placed Appellant's BAC at between .03 and .07, but the expert explained that the difference was only the result of rounding off at the third decimal place. N.T. at 139–140.

 ¶ 19 The Commonwealth implored the jury to discredit the expert's relation-back opinion, in part, because he never explained away Appellant's PBT result of .10%.[4] In so doing, the Commonwealth sent the message that the PBT was a legitimate measure of Appellant's blood alcohol content as it existed at the time of the stop. Potentially reinforcing this use of the PBT was the standard jury instruction that proof of blood alcohol content may be supplied by a chemical test of, *inter alia*, a person's breath. Given the prominence of the PBT evidence at trial, coupled with the absence of a limiting instruction,[5] we cannot disregard the likelihood that the jury misunderstood this instruction as permitting consideration of the PBT as at least adjunct proof to the blood test of BAC at the time of driving.

¶ 20 Other significant PBT references, cited *supra*, that may have entered jury deliberations on BAC included testimony that: the PBT device used was regularly calibrated for accuracy; a PBT is as accurate as radar and an intoxilyzer, devices commonly understood as admissible and probative of guilt; the PBT results here were consistent with the BAC results, and that both tests were "approved"; and the PBT measured "the then blood alcohol reading." With only threshold blood results presented at trial, significant doubt exists that the jury ignored repeated references to PBT testing and results and excluded such evidence in entering its guilty

4. Defense counsel's corresponding silence during this closing argument constitutes no waiver where the trial court had already overruled two objections regarding PBT references.

5. In *Stanley*, we found that a court compounded the prosecution's error of referring to the administration of a PBT by instructing the jury that the test is used to assist police officers in establishing probable cause to arrest. Such an instruction, we held, may have effectively supplied the jury with PBT results, as the jury was left to conclude that the defendant must have failed the test. Because the non-PBT evidence in *Stanley* was overwhelming, however, we found the error to have been harmless. Here, a *Stanley*-type limiting instruction could not have compounded error where PBT administration and specific results had already been admitted into evidence. That is not to say that a mere limiting instruction would have rendered harmless the considerable error committed below, either. *See infra*. In this DUI case supported by threshold-level evidence, only an emphatic curative instruction that the PBT is unreliable for admission at trial and shall be excluded from all consideration of the case could have cured the extensive evidentiary error committed during trial. We refer to the absence of a limiting instruction, therefore, simply to underscore how unrestricted the jury was left in considering the PBT evidence before it.

verdict. Appellant, therefore, is entitled to a new trial on the Section 3731(a)(4) charge.

¶ 21 The same dynamic compels the same conclusion in Appellant's Section 3731(a)(1) case, where the evidence was also less than overwhelming. A particular blood alcohol level is not an element to a DUI–Incapable of Safe Driving offense, but it is relevant to whether a driver had the capability to drive safely. *See Commonwealth v. Downing*, 739 A.2d 169, 173 (Pa.Super.1999) (driver's BAC of .145%, seventy-seven minutes after accident, is relevant to Section 3731(a)(1) case). Testimony that a purportedly accurate and calibrated PBT device produced a .10% result right at the scene only bolstered the conclusion that Appellant was "legally intoxicated" while driving. That a jury first so designates a driver must bear on how it then approaches the question of capability for safe driving, for the plain meaning and common understanding of the words "legally intoxicated" suggests diminished capability. That is to say, all other things being equal, the "legally intoxicated" driver will be more likely found incapable than would be the "legally sober" driver.

¶ 22 Again, in a Section 3731(a)(1) case of perhaps sufficient, but nonetheless modest, evidence, we cannot discount the possibility that PBT evidence influenced the jury's verdict. Stated in its simplest form, the evidence of Appellant's incapacity was that he lost control of his car, smelled of alcohol, had bloodshot and glassy eyes, and failed field sobriety tests. Such a case seems ample until one delves deeper into the details, which reveal: a snow and slush covered road; an attempted ninety degree left-hand turn where the car spun an additional ninety degrees but stayed on the road;[6] a responsive and clearly-spoken Appellant; and lesser test infractions in poor weather conditions. The jury, moreover, seemed to debate the quality of this case for some time, as it stopped deliberations twice to seek further instruction from the court on the Section 3731(a)(1) issue. A PBT, touted as it was, of .10% at the scene could have swayed the jury in what it seemed to consider as a close case. Appellant, therefore, is entitled to a new trial on the Section 3731(a)(1) charge as well.

¶ 23 Judgment of Sentence reversed. Case remanded for proceedings consistent with this decision. Jurisdiction relinquished.[7]

¶ 24 OLSZEWSKI, J., FILES A DISSENTING STATEMENT.

DISSENTING STATEMENT BY OLSZEWSKI, J.:

¶ 1 While the expression of the majority view provides a persuasive analysis and sound rationale, I am obliged to differ and respectfully dissent.

¶ 2 I agree with the majority that PBT results are not admissible at trial as they are not sufficiently reliable to establish the requisite elements of a DUI offense. Thus, it was an error for the trial judge to admit the results of the PBT into evidence at appellant's trial. It would have been the better practice to not admit the PBT

---

6. The Commonwealth described a one hundred eighty degree spin out that sent Appellant's car across the center line into the other lane of travel, but it is undisputed that Appellant was attempting a conventional ninety degree left-hand turn at the moment, which necessitates crossing the center line.

7. Appellant having prevailed on his first issue, we need not address the second issue he raises in his brief.

results into evidence and to give a specific instruction to the jury on this issue.

¶ 3 I am satisfied; however, that this error was harmless and did not contribute to the jury's findings of guilt. There was more than sufficient evidence presented by the Commonwealth to convict appellant on both DUI counts.

¶ 4 Therefore, I respectfully dissent.