**COMMONWEALTH of Pennsylvania,**

v.

**Ira EINHORN, Appellant.**

Superior Court of Pennsylvania.

Argued April 25, 2006.
Filed Nov. 14, 2006.

Mitchell S. Strutin, and William T. Cannon, Philadelphia, for appellant.

Peter Carr, Asst. Dist. Atty., Philadelphia, for Com., appellee.

BEFORE: HUDOCK, PANELLA, JJ. and McEWEN, P.J.E.

OPINION BY PANELLA, J.:

¶ 1 Appellant, Ira Einhorn, appeals from the judgment of sentence entered on October 17, 2002, by the Honorable William J. Mazzola, Court of Common Pleas of Philadelphia County. After careful review, we affirm.

¶ 2 In 1972, Einhorn and his girlfriend at the time, Helen "Holly" Maddux, shared an apartment in the City of Philadelphia. By September 1977, the relationship between Einhorn and Maddux was over and Maddux was residing in New York. About that time, Maddux received a telephone call from Einhorn wherein he threatened to throw away Maddux's belongings that remained in his apartment unless she returned to Philadelphia to see him. As a result, on September 10, 1977, Maddux made a trip to Philadelphia, and joined Einhorn with another couple for a movie that evening. Thereafter, Paul Herre, who rented the apartment directly below Einhorn's apartment, recalled hearing a woman's screams and repeated loud thumps, which he thought originated from Einhorn's apartment. Maddux was never again seen or heard from by her friends or family.

¶ 3 In late September 1977, residents and visitors of Einhorn's apartment building began to complain of a rancid odor emanating from Einhorn's apartment. Visitors described the odor as that of decaying flesh. Here, in the apartment below Einhorn's, noticed a brown, sticky liquid seeping from Einhorn's apartment into a pantry in his unit. The landlord, Norman Lerner, hired a roofer to investigate the source of the smell and the liquid seepage, and the roofer determined that the problem was most likely caused by a dead animal. The roofer isolated the source of the smell and seepage as a closet in the rear of Einhorn's apartment, but Einhorn refused to allow the roofer to enter the closet, which was secured with a large padlock.

¶ 4 Meanwhile, Maddux's friends and family, who had not heard from her, contacted Einhorn to ask whether he knew of Maddux's whereabouts. Einhorn stated that she was traveling, and claimed that he had not heard from Maddux. Adding to the suspicion regarding Einhorn's involvement with Maddux's disappearance was an intriguing piece of information discovered by investigating police officers: Towards the end of 1978, Einhorn attempted to purchase a book on mummification, but the owner of the bookstore was unable to locate the requested book.

¶ 5 On March 28, 1979, pursuant to a search warrant, police entered Einhorn's home, where they proceeded directly to the rear closet. The police officers pried off the padlock on the closet while Einhorn silently watched from several feet away. The closet was filled with boxes, mostly containing Maddux's personal items, as well as a locked steamer trunk which showed significant evidence of decay and fluid damage. The officers pried off the lock to the trunk and opened the lid, and were immediately struck by a strong smell of decay. Inside the trunk were the remains of Maddux, buried beneath layers of

air fresheners, plastic bags, foam peanuts, newspapers, insects, and larvae. The keys to the padlock securing the closet door, as well as the keys to the steamer trunk, were hanging from a hook in the hallway of Einhorn's apartment.

¶ 6 Einhorn was arrested and charged with first-degree murder. An autopsy revealed that Maddux had been killed by craniocerebral injuries resulting from six fractures to her face, forehead, eye sockets, and jaw, all resulting from being hit with a heavy object with great force. In April 1979, Einhorn petitioned the court for release on bail, which was subsequently granted in early May 1979. Einhorn posted security in the amount of $40,000.00 and was released. By June 1979, the pre-trial motion and discovery processes were underway, and continued through the end of December 1980.

¶ 7 In early January 1981, Einhorn fled the United States prior to a court-ordered appearance set to schedule a trial date. On January 14, 1981, a bench warrant was issued for Einhorn's arrest, bail was revoked, and the case was listed for trial to begin on January 21, 1981. On that date, with the bench warrant outstanding, the Honorable Paul Ribner re-listed the case for trial in thirty days with Einhorn in fugitive status. The case remained in that posture until early 1993.

¶ 8 On March 9, 1993, the Commonwealth filed a petition for a trial *in absentia* pursuant to Pennsylvania Rule of Criminal Procedure 1117, now renumbered as Rule 602, which provides that a "defendant's absence without cause shall not preclude proceeding with the trial including the return of the verdict and the imposition of sentence." Pa.R.Crim.P., Rule 602(A), 42 Pa. Cons. Stat.Ann. On April 15, 1993, the Honorable Juanita Kidd Stout granted the Commonwealth's petition and ordered that Einhorn be tried *in absentia*. After permitting the defense additional time for preparation, on September 13, 1993, jury selection began and was completed two days later. Following a two week trial, the jury returned a verdict of guilty of first-degree murder. On September 29, 1993, Einhorn was sentenced to life imprisonment *in absentia*.

¶ 9 Einhorn's counsel filed timely post-trial motions, arguing that Einhorn's trial *in absentia* violated both the United States and Pennsylvania Constitutions. The post-trial motions were denied on June 7, 1994, and on September 22, 1994, with Einhorn's whereabouts unknown, the timely appeal filed on his behalf was quashed.

¶ 10 In June 1997, Einhorn was located living in southern France when a driver's license application by Annika Flodin, a woman Einhorn had met and married during his fugitive years, set off a records check. Einhorn was then arrested by French police on June 13, 1997, in the village of Champagne–Mouton. Upon Einhorn's arrest, the United States immediately sought his extradition from France. In December 1997, La Cour Administrative d'Appel de Bordeaux, which had jurisdiction over Einhorn, refused to permit Einhorn's extradition to the United States. The denial of extradition was based on the French extradition court's rule that fugitives found guilty *in absentia* should automatically receive a new trial.

¶ 11 Faced with the possibility that Einhorn could remain free in southern France and never be brought to justice in the United States, the Pennsylvania General Assembly, in response to the decision of La Cour Administrative d'Appel de Bordeaux, amended the Post Conviction Relief

Act ("PCRA")[1] by late January 1998, to include the following section:

 **(c) Extradition.**—If the petitioner's conviction and sentence resulted from a trial conducted in his absence, and if the petitioner has fled to a foreign country that refuses to extradite him because a trial *in absentia* was employed, the petitioner shall be entitled to the grant of a new trial if the refusing country agrees by virtue of this provision to return him, and if the petitioner upon such return to this jurisdiction so requests. This subsection shall apply notwithstanding any other law or judgment to the contrary.

42 Pa. Cons.Stat.Ann. § 9543(c).

¶ 12 On February 19, 1999, La Cour Administrative d'Appel de Bordeaux ordered Einhorn's extradition to the United States based on the amended statute along with other assurances not relevant to our discussion herein. In July 2001, U.S. Marshals accompanied Einhorn back to Philadelphia.

¶ 13 On September 12, 2001, Einhorn filed a PCRA petition requesting a new trial, explicitly invoking § 9543(c). Simultaneously, Einhorn filed a petition for the exercise of King's Bench powers before the Pennsylvania Supreme Court, seeking a stay of his prosecution and arguing that § 9543(c) should be declared unconstitutional. Einhorn requested that the trial court not rule on his PCRA petition until the Pennsylvania Supreme Court addressed his request for a stay.

¶ 14 On November 14, 2001, following the Supreme Court's denial of Einhorn's petition for the exercise of its King's Bench powers, the Honorable D. Webster Keogh granted Einhorn's PCRA petition and ordered a new trial. On September 30, 2002, Einhorn's new trial began with Einhorn pleading not guilty to the charge of murder generally. After thirteen days of trial testimony, the jury returned a verdict of guilty to first-degree murder. Immediately thereafter, Einhorn was sentenced to life in prison.

¶ 15 On October 28, 2002, post-sentence motions in the nature of a motion in arrest of judgment or for a new trial were filed. Supplemental post-sentence motions were filed on November 19, 2002. On November 25, 2002, after argument, the trial court denied Einhorn's motions. This timely appeal followed.

¶ 16 On appeal, Einhorn raises the following issues for our review:

1. Did the trial court err in allowing evidence of other crimes and bad acts?

2. Is 42 PA.C.S.A. § 9543(c) unconstitutional?

3. Should a new trial be granted based upon prosecutorial misconduct?

4. Was Einhorn's current wife, Annika Flodin, unavailable for trial because of fear of arrest in the United States, and thus did the trial court err in not granting her immunization to assure her appearance at trial?

5. Did the trial court err in precluding testimony by Einhorn's current wife, Annika Flodin by satellite or web telecast?

6. Did the trial court err in not sequestering the trial jurors upon their selection?

7. Did the opinion testimony of Dr. Charles Tumosa violate the *Frye* standard with reference to his findings of human blood and protein in the trunk where the body of the victim was found?

8. Did the trial court err in instructing the jury that it may consider the

---

1. *42 Pa. Cons. Stat.Ann.* §§ 9541–9546.

impact of the verdict on the victim's family?

9. Did the trial court err in refusing to instruct on voluntary manslaughter?

10. Did the trial court err in instructing the jury it was not bound by the date of the killing of the victim that was specified in the Criminal Information?

Appellant's Brief, at 4.

■ ¶ 17 Einhorn first argues that he is entitled to a new trial because the trial court erred when it granted the Commonwealth's motion *in limine* allowing it to present evidence of other bad acts committed by Einhorn. The Commonwealth counters that the trial court did not abuse its discretion by admitting evidence of Einhorn's past violence against women because the purpose was to prove malice, motive, and common scheme. We find that the trial court was well within its discretion to admit evidence of Einhorn's past violence against women in order for the prosecution to prove a common scheme.

■ ¶ 18 Our standard of review with respect to evidentiary rulings has been long established: The trial court's rulings will not be disturbed absent an abuse of discretion. *See Commonwealth v. Thompson*, 779 A.2d 1195, 1200 (Pa.Super.2001), *appeal denied*, 567 Pa. 760, 790 A.2d 1016 (2001). The trial court abuses its discretion if "it misapplies the law or [rules] in a manner lacking reason." *Commonwealth v. Rega*, 856 A.2d 1242, 1244 (Pa.Super.2004) (citation omitted).

■ ¶ 19 Rule 404(b) of the Pennsylvania Rules of Evidence provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Pa.R.E., Rule 404(b)(1), 42 PA. CONS. STAT.ANN. However, "[e]vidence of

other crimes, wrongs, or acts may be admitted for other purposes, such as proof of motive, ... intent, preparation, plan, [or] knowledge...." Pa.R.E., Rule 404(b)(2), 42 PA. CONS. STAT.ANN. Therefore, evidence of other crimes or acts may be admitted if such evidence proves "a common scheme, plan or design embracing commission of two or more crimes so related to each other that proof of one tends to prove the others." Leonard Packel and Anne Bowen Poulin, PENNSYLVANIA EVIDENCE § 404–9(a) (2d ed.1999). A common scheme may be relevant to establish any element of a crime, where intent may be shown through a pattern of similar acts. *See Commonwealth v. Strong*, 825 A.2d 658, 665 (Pa.Super.2003), *appeal denied*, 577 Pa. 702, 847 A.2d 59 (2004), *cert. denied*, 544 U.S. 927, 125 S.Ct. 1652, 161 L.Ed.2d 489 (2005).

■ ¶ 20 The degree of similarity is an important factor in determining the admissibility of other crimes or bad acts under this exception. *See Commonwealth v. Luktisch*, 451 Pa.Super. 500, 680 A.2d 877, 879 (1996) (finding testimony of prior sexual abuse upon other children in the same family relevant to demonstrate a common scheme); *Commonwealth v. Smith*, 431 Pa.Super. 91, 635 A.2d 1086, 1089–1090 (1993) (holding evidence of prior crimes was admissible to show a recurring sequence of acts by defendant).

■ ¶ 21 Furthermore, the importance of the intervening time period "is inversely proportional to the similarity of the crimes in question." *Commonwealth v. Miller*, 541 Pa. 531, 548–550, 664 A.2d 1310, 1319 (1995) (finding five year lapse of time was not too remote because of similarity of crimes committed); *Luktisch*, 680 A.2d at 879 (finding time period of fourteen years and six years between acts was not excessive or remote because victims were

around the same age when abuse occurred).

¶ 22 In the present case, the Commonwealth presented evidence of Einhorn's physical assaults of his prior girlfriends, Rita Resnick and Judith Sabot, as documented in his diary. We find that the evidence of Einhorn's prior assaults against Resnick and Sabot helped establish a common scheme or plan, which was relevant to the issue of establishing Einhorn's identity as the person who killed Maddux.

¶ 23 In reference to his physical assault of Resnick, Einhorn wrote in his diary: "To kill what you love when you can't have it seems so natural that strangling Rita last night seemed so right." N.T., Trial, 10/8/02, at 37. Einhorn wrote in a diary entry on March 13, 1966, referencing Sabot:

Where am I now after having hit Judy over the head with a . . . bottle—blood on my jacket and pants—then making some feeble attempts to choke her. She wanted to live. That has been established.

Now she will leave Phila. for good. I'll be able, if she does not have me arrested, to go back to living a normal life. Violence always marks the end of a relationship—It is the final barrier over or through which no communication is possible.

Id., at 41. Einhorn's diary entry on August 24, 1977 expressed his increasing level of anxiety directed toward Maddux: "Up to the ache about Holly. Dwelling on it through my bath. No Judy, Rita, or Karen. I'm older and stronger but it hurts my accumulated karma, the mirror of what she went through, need to plunge into something." N.T., Trial, 10/15/02, at 51.

¶ 24 These declarations exemplified Einhorn's peculiar beliefs about the necessity of ending a relationship with violence and helped establish a common scheme devised by Einhorn. All three attacks were motivated by a woman ending a relationship with Einhorn. Einhorn claimed to be in love with each of the three women, and in each case, Einhorn wrote about his violent feelings in his diary and letters. The violence became increasingly severe with each break-up: Einhorn choked his first girlfriend by the throat with his hands; struck his second girlfriend with a bottle and choked her; and ultimately administered at least six violent blows to Maddux, with a blunt instrument, resulting in Maddux's death.

¶ 25 We cannot find fault in the trial court's finding that the acts were similar and timely enough to establish a common scheme, a determination adequately supported by the record. See Trial Court Opinion, 4/7/05, at 108–111. This common scheme was probative of the fundamental factual issue at trial: The identification of Maddux's killer.

¶ 26 Furthermore, we note that as a precautionary measure, the trial court appropriately instructed the jury during the trial as follows:

You must not regard this evidence as showing that the defendant is either a person of bad character or criminal tendencies from which you might be inclined to infer guilt. If you do in the end find the defendant guilty it must be because you are convinced by the evidence that he has committed the crime that is charged in the informations that are the subject matter of this trial, not because you believe he may have committed other offenses or engaged in improper conduct at other times in the past.

N.T., Trial, 10/8/02, 16–17; accord N.T., Trial, 10/16/02, 179–80.

¶ 27 It must be presumed as a matter of law that the jury did not consider the evidence of the prior assaults for any improper purpose. *See Commonwealth v. Brown,* 567 Pa. 272, 289, 786 A.2d 961, 971 (2001), *cert. denied,* 537 U.S. 1187, 123 S.Ct. 1351, 154 L.Ed.2d 1018 (2003) ("The law presumes that the jury will follow the instructions of the court."). Thus, because the evidence of prior bad acts was introduced to demonstrate a common scheme of violence, capable of supporting an inference that it was Einhorn and not some other person who killed Maddux, and because the jury was properly instructed, we find that the trial court did not abuse its discretion in allowing the admission of such testimony.

¶ 28 In his second issue presented on appeal, Einhorn asserts that he is entitled to an arrest of judgment and an order directing that he be returned to France as a result of the trial court's denial of his pre-trial motion to dismiss the charges based upon the unconstitutionality of § 9543(c).[2] Einhorn's argument centers on the contention that his extradition was unlawful based on the unconstitutionality of § 9543(c). Regardless of the constitutionality of § 9543(c), the relief requested by Einhorn, i.e., a declaration that his extradition was unlawful, is unobtainable.

¶ 29 As mentioned, in December 1997, La Cour Administrative d'Appel de Bordeaux, which had jurisdiction over Einhorn, refused to permit his extradition back to the United States. The denial of extradition was based on the French court's rule that fugitives found guilty *in absentia* should automatically receive a new trial. Thereafter, the Pennsylvania General Assembly, in response to the decision of La Cour Administrative d'Appel de Bordeaux, amended the Post Conviction Relief Act by late January 1998. On February 19, 1999, La Cour Administrative d'Appel de Bordeaux ordered Einhorn's extradition to the United States based on, *inter alia,* the amended statute.

¶ 30 Einhorn argues that his extradition is unlawful due to the alleged unconstitutionality of § 9543(c). We need not address the constitutionality of that section, however, as this Court cannot deem Einhorn's extradition unlawful.[3] France's decision to extradite Einhorn was predicated upon, *inter alia,* his receiving a new trial. At Einhorn's request, he received a new trial. Accordingly, we must defer to France's decision to extradite Einhorn, as

---

**2.** We note that in his brief Einhorn also claims that the second trial violated double jeopardy. Because this particular claim was not included in his statement of questions in his brief, we are constrained to find it waived. *See Commonwealth v. Kittelberger,* 420 Pa.Super. 104, 616 A.2d 1, 3 n. 6 (1992) ("[T]his particular claim is waived because appellant failed to properly preserve it for appellate review by specifically including it in his statement of questions."). In addition, Einhorn fails to support his double jeopardy argument with citation to proper authority. As such, this claim is further waived. *See Commonwealth v. Lutes,* 793 A.2d 949, 960 (Pa.Super.2002) ("Issues raised but not supported by citation to authority are waived."). In any event, we note that in September 2001, Einhorn filed a petition seeking a new trial under

§ 9543(c). Thereafter, in November 2001, Einhorn's petition for a new trial was granted in the Court of Common Pleas of Philadelphia. Therefore, for a third reason, Einhorn's double jeopardy claim has been waived. *See Commonwealth v. Sanford,* 497 Pa. 442, 444, 441 A.2d 1220, 1221 (1982) ("Appellant's voluntary act of seeking and receiving a new trial constitutes a waiver of any double jeopardy claim.").

**3.** Our disposition adheres to the well established principle that "a court should not reach [a] constitutional claim if a case can properly be decided on non-constitutional grounds[.]" *Commonwealth v. Kennedy,* 583 Pa. 208, 225 n. 10, 876 A.2d 939, 949 n. 10 (2005) (citation omitted).

we have no authority to rule that the action of La Cour Administrative d'Appel de Bordeaux was unlawful. *See United States v. Campbell*, 300 F.3d 202, 209 (2d Cir.2002), *cert. denied*, 538 U.S. 1049, 123 S.Ct. 2114, 155 L.Ed.2d 1090 (2003) ("[O]ur courts cannot second-guess another country's grant of extradition to the United States."); *United States v. Medina*, 985 F.Supp. 397, 401 (S.D.N.Y.1997) ("[A] foreign government's decision to extradite an individual in response to a request from the United States is not subject to review by United States courts."). Therefore, we do not reach the constitutional issue because we do not have the authority to grant the relief requested by Einhorn.

■ ¶ 31 In his third issue presented on appeal, Einhorn claims that he is entitled to an arrest of judgment as a result of the trial court's denial of his pre-trial motion to bar prosecution based on prosecutorial misconduct. Specifically, Einhorn claims that the Commonwealth erred by confiscating his personal diaries pursuant to a valid search warrant and making the diaries available to Steven Levy, who authored the book "The Unicorn's Secrets," a novel which Einhorn claims turned public sentiment against him and precluded him from receiving a fair trial. Einhorn also contends that the Commonwealth improperly delivered the forensic material collected from the crime scene to the Federal Bureau of Investigation for testing.[4] We find that the claims are waived because Einhorn cites neither to the record in or-

der to substantiate his factual allegations, nor to authority establishing that the alleged actions constitute misconduct.

 ¶ 32 "Our standard of review for a claim of prosecutorial misconduct is limited to whether the trial court abused its discretion." *Commonwealth v. Harris*, 884 A.2d 920, 927 (Pa.Super.2005) (citation and internal quotation marks omitted). "In considering this claim, our attention is focused on whether [Einhorn] was deprived of a fair trial, not a perfect one." *Id.* (citations omitted).

 ¶ 33 An appellate brief must provide citations to the record and to any relevant supporting authority. This Court will not become the counsel for an appellant, "and will not, therefore, consider issues ... which are not fully developed in [the] brief." *Commonwealth v. Drake*, 452 Pa.Super. 315, 681 A.2d 1357, 1360 (1996) (citation omitted). Failing to provide factual background and citation to the record represent serious deviations from the briefing requirements of the Rules of Appellate Procedure.[5] *See Commonwealth v. Miller*, 721 A.2d 1121, 1124 (Pa.Super.1998). An issue that is not properly briefed in this manner is considered waived, "as such an omission impedes our ability to address the issue on appeal." *Id.*

¶ 34 Einhorn provides no citations to the record supporting his claims, nor does he provide any citations to authority supporting his position. Consequently, Einhorn's

---

4. Einhorn also raises a laundry list of claims in his brief which he did not raise in his statement of questions involved, therefore waiving review of these issues. *See* Pa.R.A.P., Rule 2116(a), 42 Pa. Cons. Stat.Ann. (requiring that each assignment of error contained in the argument be mentioned in the statement of questions involved).

5. Pursuant to Pa.R.A.P, Rule 2101, 42 Pa. Cons.Stat.Ann., appellate briefs should con-

form in all material respects with the specific requirements of the Rules, and failure to do so may result in the brief being dismissed or quashed. Rule 2119, pertaining to the Argument section of an appellate brief, specifically requires citations to the record, and where the refusal to find a fact is argued, a synopsis of all the evidence on point is required. *See* Pa.R.A.P., Rule 2119(c), (d), 42 Pa. Cons. Stat. Ann.

argument that the prosecution engaged in misconduct is waived. *See id.*

¶ 35 In his fourth issue presented on appeal, Einhorn contends that the trial court erred when it denied his pre-trial motion to grant immunity to his wife, Annika Flodin. Einhorn claims that because the trial court did not grant the immunity requested, he could not properly defend himself against the charge of murder. The Commonwealth maintains that the trial court correctly determined that it had neither authority nor sufficient reason to extend immunity to Einhorn's wife.

¶ 36 In Pennsylvania, courts have no power to grant immunity unless the district attorney or Attorney General requests an immunity order. *See* 42 Pa. Cons. Stat.Ann. § 5947(b). The decision to seek a grant of immunity in any given case rests within the judgment of the prosecutor, and if such request complies with the immunity statute, then immunity must be granted. *See Commonwealth v. Hall*, 867 A.2d 619, 634 (Pa.Super.2005), *appeal denied*, 586 Pa. 756, 895 A.2d 549 (2006) (opining that appellant's trial counsel cannot be held ineffective for failing to request immunity for a witness because only the prosecution can request immunity); *see also Commonwealth v. Johnson*, 507 Pa. 27, 31, 487 A.2d 1320, 1322 (1985) (holding trial court did not err in not granting immunity since the court had no authority to immunize and prosecutor had made no request to do so).

¶ 37 In the present case, the defense requested that the Commonwealth ask for a grant of immunity from the Court in order to allow Flodin to testify. Because the Commonwealth did not proffer this request, the trial court lacked legal authority to do so. *See, e.g., Commonwealth v. Mulholland*, 549 Pa. 634, 651, 702 A.2d 1027, 1035 (1997) (the decision as to whether immunity should or should not

be granted to a witness rests entirely within the judgment of the *executive* branch of government, i.e., the Attorney General or District Attorney).

¶ 38 Einhorn argues further that the trial court did have the authority to grant use immunity to a defense witness absent a request by the prosecution. Einhorn contends that the trial court is required to grant use immunity even absent a request by the prosecution when: (1) The prosecutor is engaged in misconduct with the deliberate intention of distorting the fact-finding process, or (2) when there is no evidence of prosecutorial misconduct, but it is discovered that a potential defense witness can offer testimony which is "clearly exculpatory or essential to the defense's case and the government has no strong interest in withholding use immunity." Appellant's Brief, at 47–48 (quoting *Government of Virgin Islands v. Smith*, 615 F.2d 964, 974 (3d Cir.1980)).

¶ 39 *Smith*, however, has been found to be contrary to Pennsylvania's statutory scheme, and is not binding on Pennsylvania courts. *See Commonwealth v. Champney*, 574 Pa. 435, 456, 832 A.2d 403, 415–416 (2003), *cert. denied*, 542 U.S. 939, 124 S.Ct. 2906, 159 L.Ed.2d 816 (2004) (noting that *Smith* does not bind Pennsylvania courts and declining to extend use immunity to a defense witness where appellant failed to demonstrate that such testimony was clearly exculpatory).

¶ 40 However, even if the holding in *Smith* were binding precedent in this jurisdiction, Einhorn's claim would still fail. The trial court found that there was no evidence that the Commonwealth engaged in prosecutorial misconduct, and Einhorn does not point out any evidence of misconduct in the record. To the contrary, the trial court found that the Commonwealth had a strong interest

in denying immunity because Flodin is the potential target of prosecution as a result of her role in intentionally harboring her fugitive husband, Einhorn. Furthermore, Einhorn completely fails to demonstrate that Flodin's testimony would be "clearly exculpatory" and that *but for* the unavailability of that testimony, the result of the proceeding would have been different. *See Smith,* 615 F.2d at 974. A review of the record indicates that Flodin did not know Einhorn at the time of his flight. Furthermore, Einhorn does not even put forth her proposed exculpatory testimony. Because there is no evidence of prosecutorial misconduct, and because Einhorn has not established that Flodin's testimony would be clearly exculpatory, the application of *Smith* would not result in a different disposition. Thus, Einhorn's claim fails in any event.

■ ¶ 41 In his fifth issue presented on appeal, Einhorn argues that he is entitled to a new trial as a result of the trial court's denial of the pre-trial motion to take Flodin's testimony by satellite or web telecast during trial. The Commonwealth claims that this refusal was well within the discretion of the trial court.

■ ¶ 42 We evaluate the trial court's determinations regarding the admissibility of evidence by an abuse of discretion standard. *See Commonwealth v. Dengler,* 586 Pa. 54, 64–66, 890 A.2d 372, 379 (2005). We will not disturb the trial court's ruling unless that ruling reflects "manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support as to be clearly erroneous." *Id.* (citation omitted).

■ ¶ 43 Upon motion of any party, a court may order the taking and preserving of the testimony of a witness who "may be unavailable for trial or for any other proceedings, or when due to exceptional circumstances, it is in the interests of justice that the witness' testimony be preserved." Pa.R.Crim.P., Rule 500(a)(1), 42 Pa. Cons. Stat.Ann. An unavailable witness is a witness who is not capable of appearing in court and giving testimony directly, for reasons such as illness or incapacitation. *See Commonwealth v. Rizzo,* 556 Pa. 10, 16, 726 A.2d 378, 381 (1999) (finding the language "may be unavailable" not applicable to situations where a witness could feasibly be present at trial).

¶ 44 Flodin was not an unavailable witness. She was healthy and able to appear in court, and thus, there was no need to preserve her testimony since she was capable of presenting it in person. The trial court found that although Flodin was not immunized, she was indeed available, and thus the trial court refused to permit Flodin to testify by satellite or web telecast. We find this determination to be well within the trial court's broad discretion.[6] Thus, Einhorn's claim that the trial court abused its discretion is without merit.

■ ¶ 45 In his sixth issue presented on appeal, Einhorn contends that the trial court erred by refusing to sequester jurors immediately after their placement on the jury, and that he should be granted a new trial without having to show that he was prejudiced by the refusal. The Commonwealth responds that it was within the discretion of the trial court to allow the future jurors to return home briefly to pack their belongings and put their affairs

---

6. In addition, as previously stated, the relevance of Flodin's proffered testimony is questionable. Flodin did not know Einhorn until years after the murder of Maddux, and Einhorn has not disclosed in his brief the relevancy of her testimony to the issues in his criminal trial. Therefore, the omission of her testimony from the present case, based upon the record before us, did not prejudice Einhorn as he asserts.

in order. We find that Einhorn is not entitled to a new trial because of the trial court's refusal to immediately sequester the jurors; the trial court was well within its discretion to allow the jurors to return home and pack for an anticipated extended stay. Furthermore, as Einhorn seemingly concedes, he has not demonstrated that he was prejudiced in any way by this decision.

■ ¶ 46 Pennsylvania Rule of Criminal Procedure 642 provides that a trial judge may, in the interests of justice, order sequestration of jurors in the judge's discretion. *See* Pa.R.Crim.P., Rule 642, 42 PA. CONS. STAT.ANN. A trial judge's refusal to order sequestration will not, however, be reversed unless the appellant makes a "proper showing of potential prejudice." *Commonwealth v. Gorby*, 527 Pa. 98, 110, 588 A.2d 902, 908 (1991) (citation omitted). The trial judge's decision to grant or deny juror sequestration will not be reversed absent an abuse of discretion. *See Commonwealth v. Bruno*, 466 Pa. 245, 257, n. 5, 352 A.2d 40, 46, n. 5 (1976). We note that the same abuse of discretion standard has been applied when reviewing a trial court's decision to allow an overnight dispersal of the jury. *See Commonwealth v. Jones*, 340 Pa.Super. 448, 490 A.2d 863, 867 (1985).

■ ¶ 47 Einhorn points to the language of Rule 642(b) of the Pennsylvania Rules of Criminal Procedure, which states that "[w]hen sequestration is ordered, each juror, including any alternate, shall be sequestered from the time of acceptance as a juror until discharged." This rule has been interpreted flexibly by the courts; a trial procedure which deviates from strict sequestration from the time jurors are initially selected is allowed. *See Commonwealth v. Chambers*, 546 Pa. 370, 386–7, 685 A.2d 96, 104 (1996), *cert. denied*, 522 U.S. 827, 118 S.Ct. 90, 139 L.Ed.2d 46 (1997) (finding no abuse of discretion where jurors were not sequestered before a two-week continuance when judge instructed jurors to avoid press accounts of the trial); *see also Jones*, 490 A.2d at 867 (holding that trial court has authority to permit jurors to disperse overnight).

¶ 48 Accordingly, in the present case, we find that the trial court did not abuse its discretion by permitting sequestration to be suspended for one day for the selected jurors to return home for a night to prepare for an extended trial. The trial court made the decision to allow the jurors to return home out of convenience to the jurors, understanding that sequestration imposes a great burden on jurors by literally interrupting their daily routines. *See* N.T., Trial, 9/17/02, at 59. The decision was reasonable, and does not constitute an abuse of discretion.

¶ 49 We recognize the importance of jurors remaining impartial and not influenced by any outside sources that could result in prejudice to the defendant. However, a defendant must demonstrate that he or she was actually prejudiced by a trial judge's sequestration order before any relief may be warranted. *See, e.g., Jones*, 490 A.2d at 867 (holding that error may only be shown with proof that such dispersal resulted in prejudice or harm to defendant). As aforesaid, in the case at hand, Einhorn has not demonstrated that the decision to suspend sequestration overnight resulted in prejudice.

¶ 50 In addition to sequestration, the trial court granted a defense motion for individual *voir dire*. *See* N.T., Trial, 9/10/02, at 3. The entire pool of potential jurors was told about the presumption of innocence. *See* N.T., Trial, 9/17/02, at 15–16. The jurors were also told to follow the judge's instructions when deciding the case, and to put personal impressions aside. *See id.*, at 33–34. During *voir dire*, the trial court asked the potential jurors

questions regarding their exposure to media coverage and whether they had a fixed opinion about Einhorn's guilt or innocence. *See id.* All the jurors selected responded that they could put outside influences, information, and personal impressions aside and render their decision based only on what was presented at trial. *See id.* The jurors swore under oath that they could render their decision based only on what was presented during trial. *See N.T.*, Trial, 9/30/02, at 27.

¶ 51 Furthermore, the two newspaper articles that Einhorn cites in his brief both gave accounts of the jury selection process, and did not mention the specific facts of the case. *See N.T.*, Trial, 9/25/02, at 4; *see also N.T.*, Trial, 9/26/02, at 4. Even if the jurors disobeyed the trial judge's instructions and ignored their oath by reading the two newspaper articles, the articles did not contain facts of the case, and cannot be used to establish prejudice. Therefore, we find that the trial court did not abuse its discretion by allowing the jurors to return home overnight to put their affairs in order and pack their belongings in preparation for the trial.

■ ¶ 52 Next, in his seventh issue presented on appeal, Einhorn asserts that he is entitled to a new trial because the testimony of the Commonwealth's witness, Dr. Charles Tumosa, violated the *Frye*[7] standard in that the testing procedures utilized were not accepted or recognized by the forensic science community. In support of his argument, Einhorn points to the testimony of Vincent Cordova, a defense witness accepted as an expert in the field of forensic and chemical analyses with a specialty in criminalistics. Mr. Cordova questioned Dr. Tumosa's methodology in

determining the presence of human blood or protein, and testified that it was not an acceptable technique. The Commonwealth maintains that the claim has no merit, and in any regard has been waived. We agree that this issue has not been properly preserved for review because Einhorn raised it for the first time on appeal.

¶ 53 At trial, Dr. Charles Tumosa testified that he was present as a member of the Philadelphia Police Criminalistics Unit during the search of Einhorn's apartment on March 28, 1979. It was in that capacity when he first observed Maddux's body inside the trunk.[8] Dr. Tumosa used his physical findings of human blood and protein to support his opinion that the body had decomposed inside the trunk. *See N.T.*, Trial, 10/07/02, at 22–46.

¶ 54 Dr. Tumosa described the tests he performed for human protein, which produced positive results for the fluid inside the trunk. However, although Mr. Cordova agreed that Dr. Tumosa's initial technique was the traditional standardized approach for the detection of human blood and protein, the second separation technique utilized by Dr. Tumosa differed from the traditional standard technique, and, according to Mr. Cordova, was not an acceptable separation technique supported by literature in the field of forensic science. *See N.T.*, Trial, 10/10/02, at 136–137.

¶ 55 In determining whether novel scientific evidence is admissible in criminal trials, Pennsylvania courts apply the test set forth in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923). *See Commonwealth v. Topa*, 471 Pa. 223, 231, 369 A.2d 1277 (1977) (adopting the *Frye* test in Pennsylvania). Under *Frye*, novel scientific evidence is admissible if the methodology that

7. *Frye v. United States,* 293 F. 1013 (D.C.Cir. 1923).

8. Dr. Tumosa was qualified and accepted as a research chemist with specialization in the area of materials collection and preservation.

underlies the evidence has general acceptance in the relevant scientific community. *See Grady v. Frito–Lay, Inc.,* 576 Pa. 546, 555, 839 A.2d 1038, 1044–1045 (2003). While the United States Supreme Court has since found that the *Frye* test has been superseded by the more permissive Federal Rules of Evidence, *see Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), Pennsylvania courts are not bound by the Federal Rules of Evidence, and continue to apply the *Frye* standard, *see Grady,* 576 Pa. at 556, 839 A.2d at 1044.

■ ¶ 56 While Einhorn claims that the testimony of Dr. Tumosa was inadmissible pursuant to *Frye,* he never filed a motion *in limine* seeking to preclude Dr. Tumosa's testimony on the basis of *Frye,* nor did he request a *Frye* hearing. At trial, Einhorn attempted to impeach Dr. Tumosa through cross-examination in which trial counsel questioned the acceptability of Dr. Tumosa's utilized method; however, at no time did Einhorn seek to preclude the testimony based on a *Frye* assessment prior to this appeal. *See N.T.,* Trial, 10/17/02, at 80–82. As a general rule, "issues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P., Rule 302(a), 42 Pa. Cons. Stat.Ann. Thus, because of Einhorn's failure to preserve this

claim in the trial court, the issue is waived.[9]

■ ¶ 57 Einhorn next asserts, in his eighth issue presented on appeal, that he is entitled to a new trial as a result of the trial court's instruction that the jury should consider the impact the verdict would have on the family of the victim.[10] We find that this claim warrants no relief because the trial court gave supplemental instructions at Einhorn's request and because the jury charge, when considered as a whole, expressed unmistakably that the verdict was to be based solely on the evidence.

■ ¶ 58 Our standard of review with respect to jury instructions is well settled. When reviewing a challenge to part of a jury instruction, we must review the jury charge as a whole to determine if it is fair and complete. *See Commonwealth v. Hawkins,* 549 Pa. 352, 390, 701 A.2d 492, 511 (1997). A trial court has wide discretion in phrasing its jury instructions, and "can choose its own words as long as the law is clearly, adequately, and accurately presented to the jury for its consideration." *Id.,* at 391, 701 A.2d at 511. The trial court commits an abuse of discretion only when there is an inaccurate statement of the law. *See id.*

---

9. In any event, as the trial court aptly notes in its meticulous and well-written 218 page opinion, the presence of proteins in the trunk was not essential to Dr. Tumosa's testimony, much less a factor at the trial. Dr. Tumosa repeatedly explained that his opinion that the body had decomposed inside the trunk did not depend on the discovery of the trace amounts of protein. In summary, given the undisputable and overwhelming physical evidence uncovered during the discovery of Ms. Maddux's body, there was no question that Ms. Maddux's body had been decomposing in the trunk. Thus, even if this limited amount of testimony from Dr. Tumosa violated the *Frye* standard, the trial court concluded that

any potential error would have been harmless. *See Commonwealth v. Marshall,* 824 A.2d 323, 328 (Pa.Super.2003) (an error is harmless if the court determines that the error could not have contributed to the verdict).

10. The disputed section of the jury instruction provided:

Your decision in this case is a matter of considerable importance, not because of its notoriety but because of what it will mean to the defendant, the Commonwealth, and the family of the deceased.

N.T., Trial, 10/16/02, at 193–194.

¶ 59 After the trial court finished instructing the jury, Einhorn's trial counsel expressed concern about the reference the trial court had made to the importance of the verdict to the family of Holly Maddux. The trial court offered to give an additional instruction emphasizing again that the jury's verdict must be based solely on the evidence and was not to be influenced by sympathy for either side. Einhorn's trial counsel responded that this would be "fine," and the supplemental instruction was given.[11] *See N.T.*, Trial, 10/16/02, at 199–200. Because no further relief was requested by Einhorn, he may not now complain of the trial court's error in instructing the jury. *See Commonwealth v. Hill*, 479 Pa. 346, 352, 388 A.2d 689, 692 (1978) (defendant who requests and receives relief for alleged error may not seek additional relief at a later time).

■■■ ¶ 60 Furthermore, an examination of the jury instructions reveals that the jurors were properly instructed to consider only the evidence. Jury instructions must be considered in the context of the overall charge; a single instruction may not be reviewed in isolation. *See Hawkins*, 549 Pa. at 391, 701 A.2d at 511. When viewed as a whole, the trial court's instructions clearly expressed that the verdict was to be based solely on the evidence:

> Remember that it is your responsibility as jurors to perform your duties and *reach a verdict based upon the evidence presented.*
>
> However, in deciding the facts you may properly apply common sense and draw upon your own every day practical knowledge of life as each of you have experienced it.
>
> You should *keep your deliberations free from any bias or prejudice.* Both the Commonwealth and the defendant have the right to expect you to consider the evidence conscientiously and to *apply the law as I have tried to outline it for you.*

N.T., Trial, 10/16/02, at 194 (emphasis added).

¶ 61 Clearly, the record shows that the trial court expressed the importance to the jury of reaching a verdict based solely on the evidence. Furthermore, the supplemental instructions reaffirmed the necessity of applying the law without prejudice or sympathy for either side. For that reason, we find that Einhorn is not entitled to a new trial because of the trial court's reference to the victim's family.

■■■ ¶ 62 In his ninth issue presented on appeal, Einhorn argues that he is entitled to a new trial as a result of the trial court's refusal to instruct the jury on voluntary manslaughter pursuant to his request. Specifically, he maintains that the trial court erred in not instructing the jury on heat of passion voluntary manslaughter. Unquestionably, the denial of the voluntary manslaughter instruction was justified and proper under the evidence presented at trial.

¶ 63 A person is guilty of voluntary manslaughter if at the time of the killing he acted under a sudden and intense passion resulting from serious provocation by the victim. *See* 18 Pa. Cons. Stat.Ann. § 2503(a). "Heat of passion" includes

---

11. The supplemental instruction stated:
 And before you go I'll remind you that you should keep your deliberations free of any bias or prejudice in favor of either side or sympathy for either side. Each side, both the Commonwealth and defendant, have the right to expect you to consider the evidence conscientiously, objectively, unemotionally, and apply the law as I have outlined it to you.
 N.T., Trial, 10/16/02, at 203.

emotions such as "anger, rage, sudden resentment or terror, which renders the mind incapable of reason." *Commonwealth v. Speight*, 544 Pa. 451, 467, 677 A.2d 317, 324–325 (1996), *cert denied*, 519 U.S. 1119, 117 S.Ct. 967, 136 L.Ed.2d 852 (1997).

■ ¶ 64 A trial court commits an abuse of discretion with reference to the jury charge only when there is an inaccurate statement of the law. *See Hawkins*, 549 Pa. at 390–391, 701 A.2d at 511. Furthermore, a trial court should only instruct on an offense where the offense has been made an issue in the case and where there is evidence which supports the elements of the offense. *See Commonwealth v. Thomas*, 552 Pa. 621, 640, 717 A.2d 468, 478 (1998), *cert denied*, 528 U.S. 827, 120 S.Ct. 78, 145 L.Ed.2d 66 (1999) (holding failure to instruct on voluntary manslaughter appropriate where no evidence existed to show that appellant killed the victim in a sudden and intense passion); *see also Commonwealth v. Browdie*, 543 Pa. 337, 349–350, 671 A.2d 668, 674 (1996) (affirming trial court's determination that defendant was not entitled to a voluntary manslaughter instruction when no evidence in the case supported such a verdict).

¶ 65 At trial, Einhorn testified that he did not kill Holly Maddux. *See N.T.*, Trial, 10/14/02, at 197. Furthermore, Einhorn described the events surrounding Maddux's alleged "disappearance" as peaceful, without any violence:

- N.T., Trial, 10/14/02, at 131–132 (stating that he only had "mixed emotions" about Maddux's plans to take a boat trip with another man);

- N.T., Trial, 10/14/02, at 133–135 (stating that he was in the bathtub when Maddux left the apartment to make a phone call, after which she did not return); and

- N.T., Trial, 10/15/02, at 117–118 (stating that he never considered violence against Maddux, and that their relationship was not over).

¶ 66 Because Einhorn did not present any evidence that he acted under the heat of passion—indeed he claimed he did not kill Maddux and that the pair had a peaceful parting—a heat of passion instruction was not supported by the record. *See Speight*, 544 Pa. at 467, 677 A.2d at 325 (holding that heat of passion instruction was inconsistent with defendant's claim that he did not kill the victims). The court properly instructed the jury on all relevant legal issues raised at trial, and no prejudice resulted from the omission of the heat of passion voluntary manslaughter instruction.

■ ¶ 67 Finally, in his tenth issue presented on appeal, Einhorn claims that he is entitled to a new trial as a result of the trial court instructing the jury that in assessing his guilt, the jury was not bound by the date of the killing of the victim that was alleged in the information.[12] The Commonwealth responds that there was no prejudicial variance between the jury instructions and the charging documents regarding the date of the offense.

■ ¶ 68 It is the duty of the prosecution to "fix the date when an alleged offense occurred with reasonable certainty...." *Commonwealth v. Jette*, 818 A.2d

---

12. The instruction at issue stated:

As an aside, I would also advise you that you are not necessarily bound by the date alleged in the indictment in this case. The date of death is not an essential element of the crime. You may find the defendant guilty if you are satisfied beyond a reasonable doubt that he committed the crime charged even though you're not satisfied that it occurred precisely on the specific date mentioned in the bill of indictment. N.T., Trial, 10/16/02, at 184.

533, 535 (Pa.Super.2003) (citation omitted). However, "[d]u[e] process is not reducible to a mathematical formula," and the Commonwealth does not always need to prove a single specific date of an alleged crime. *Commonwealth v. Devlin*, 460 Pa. 508, 515–516, 333 A.2d 888, 892 (1975). Permissible leeway varies with the nature of the crime and the age and condition of the victim balanced against the rights of the accused. *See id.; see also Commonwealth v. Ables*, 404 Pa.Super. 169, 590 A.2d 334, 339 (1991), *appeal denied*, 528 Pa. 620, 597 A.2d 1150 (1991).

¶ 69 In the present case, the precise date of the offense is unknown. There were no witnesses to the crime capable of providing such information, and the victim's body had mummified, impairing medical examiners from giving more than the most general of timeframes. *See N.T., Trial*, 10/4/02 at 32, 61. The time period chosen for the murder resulted from a number of factors including the last time that friends and family saw or heard from Maddux, i.e., sometime after September 10th or 11th, 1977, and an issue of the September 15, 1977 edition of the *Philadelphia Bulletin* found in the trunk with Maddux's body. *See N.T., Trial*, 9/30/02, at 129–30, 188–90; N.T., Trial, 10/2/02 at 7, 37; N.T., Trial, 10/7/02, at 27. Therefore, flexibility was warranted in fixing the date of the offense considering the circumstances surrounding Maddux's death.

■ ¶ 70 Additionally, "indictments must be read in a common sense manner and are not to be construed in an overly technical sense." *Commonwealth v. Ohle*, 503 Pa. 566, 588, 470 A.2d 61, 73 (1983) (citation omitted). The purpose of the indictment is to provide the accused with sufficient notice to prepare a defense. *See id.* A variance is not fatal unless it could mislead the defendant at trial, impairs a substantial right or involves an element of surprise that would prejudice the defendant's efforts to prepare his defense. *See id.*, at 589, 470 A.2d at 73.

■ ¶ 71 Einhorn was not surprised or misled at trial. Furthermore, the date was not an essential element of the case. Einhorn had more than sufficient notice of the crimes with which he had been charged as well as sufficient specificity of the factual allegations supporting the elements of those crimes. At trial, the Commonwealth's evidence was overwhelming, and was presented with a pattern of consistency throughout the trial. Einhorn has not proven that the jury instruction prejudiced him in any way. Thus, we find that his last claim is meritless.

¶ 72 In summary, because we find that none of Einhorn's issues warrant relief, we affirm the judgment of sentence entered by the trial court.

¶ 73 Judgment of sentence affirmed. Jurisdiction relinquished.