J-S65027-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| KIRK CARRINGTON, | |
| Appellant | No. 3127 EDA 2014 |

Appeal from the Judgment of Sentence October 2, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0006608-2012, CP-51-CR-0006609-2012

BEFORE: BENDER, P.J.E., SHOGAN, and JENKINS, JJ.

MEMORANDUM BY SHOGAN, J.: **FILED NOVEMBER 06, 2015**

Appellant, Kirk Carrington, appeals from the judgment of sentence entered October 2, 2014. We affirm.

The voluminous factual history of this matter is well known to the parties and is comprehensively restated by the trial court in its opinion filed February 26, 2015; thus, there is no need to restate it here. To briefly summarize, however, this case involves Appellant's sexual abuse of his niece, A.C., over the course of seven years. On March 9, 2012, Appellant was arrested and charged with rape, attempted rape, involuntary deviate sexual intercourse (IDSI), unlawful contact with a minor, aggravated indecent assault, indecent assault, incest, endangering the welfare of a child ("EWOC"), contempt for violation of a protection order, and violations of

Megan's Law. Following a four-day jury trial, Appellant was convicted of incest, EWOC, contempt for violation of a protection-from-abuse order, and violations of Megan's Law.[1] The Sex Offender Assessment Board conducted an assessment of Appellant and found him to be a sexually violent predator on November 15, 2013. The trial court agreed with that finding; however, on October 2, 2014, the jury's finding of guilt on the charges of failure 1) to comply with the registration requirement and 2) to provide accurate information was vacated by agreement after Megan's Law III[2] was found to be unconstitutional.[3]

On October 2, 2014, Appellant was sentenced to four to eight years of imprisonment for incest followed by a two-and-one-half-to-five-year term of incarceration for EWOC. The court imposed no further penalty for contempt. Thus, the total aggregate sentence was six and one-half to thirteen years of

---

[1] Appellant was acquitted of rape of a child less than thirteen years old, attempted rape of a child less than thirteen years old, involuntary deviate sexual intercourse of a child less than thirteen years old, aggravated indecent assault of a child less than thirteen years old, indecent assault of a child less than thirteen years old, and unlawful contact with a minor.

[2] Act of November 24, 2004, P.L. 1243 (Act 152), commonly known as Megan's Law III. *Coppolino v. Noonan*, 102 A.3d 1254, 1258 n.2 (Pa. Cmwlth. 2014) (*en banc*).

[3] *See Commonwealth v. Neiman*, 84 A.3d 603, 613-616 (Pa. 2013) (holding that adoption of Megan's Law III was violative of the "single subject" rule of Article III, Section 3 of the Pennsylvania Constitution, and finding "that the proper remedy for this violation of our Constitution is to strike [Megan's Law III] in its entirety."

imprisonment. Appellant filed a counseled notice of appeal on October 31, 2014. Both Appellant and the trial court complied with Pa.R.A.P 1925.

Appellant raises the following three issues in his brief:

I. Is [Appellant] entitled to a new trial as the evidence is insufficient to establish the crime of Incest?

II. Is [Appellant] entitled to a new trial where the [c]ourt erred in admitting 404(b) evidence where the evidence was irrelevant and if relevant should have been excluded as it was grotesquely and unfairly prejudicial to [Appellant] and where [Appellant] did not receive a fair trial as a result thereof?

III. Is [Appellant] entitled to a new trial as a result of the [c]ourt's error in admitting hearsay?

Appellant's Brief at 3.

Appellant's first issue relates to the sufficiency of the evidence.[4] In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. *Commonwealth v. Diamond*, 83 A.3d 119 (Pa. 2013). It is within the province of the fact-finder to determine the weight to be accorded to

---

[4] Appellant failed to ensure that the certified record was complete, and this Court was forced to seek transcripts from August 14, 2013 (Volume 1) and August 13, 2013. *See Commonwealth v. Griffin*, 65 A.3d 932, 936 (Pa. Super. 2013 (The appellant has the duty to ensure that the record is complete for purposes of appellate review). Moreover, we note that the transcript for the afternoon session of August 14, 2013, is mislabeled as "Preliminary Hearing Volume 1."

each witness's testimony and to believe all, part, or none of the evidence. ***Commonwealth v. Tejada***, 107 A.3d 788, 792–793 (Pa. Super. 2015). The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. ***Commonwealth v. Vogelsong***, 90 A.3d 717 (Pa. Super. 2014), *appeal denied*, 102 A.3d 985 (Pa. 2014). Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder. ***Commonwealth v. Rogal***, 120 A.3d 994 (Pa. Super. 2015).

In his Pa.R.A.P. 1925(b) statement, Appellant merely averred that the "evidence is insufficient" and the "verdict is based on speculation, conjecture and surmise." Pa.R.A.P. 1925(b) Statement, 1/23/15, at 1. Rule 1925 requires that an appellant "concisely identify each ruling or error that the appellant intends to challenge **with sufficient detail to identify all pertinent issues**[.]" Pa.R.A.P. 1925(b)(4)(ii) (emphasis added). "When a court has to guess what issues an appellant is appealing, that is not enough for meaningful review." ***Commonwealth v. Allshouse***, 969 A.2d 1236, 1239 (Pa. Super. 2009). "When an appellant fails adequately to identify in a concise manner the issues sought to be pursued on appeal, the trial court is impeded in its preparation of a legal analysis which is pertinent to those issues." ***Id***.

Specifically, we have stated that "[i]n order to preserve a challenge to the sufficiency of the evidence on appeal, an appellant's Rule 1925(b)

statement **must state with specificity the element or elements upon which the appellant alleges that the evidence was insufficient**." *Commonwealth v. Garland*, 63 A.3d 339, 344 (Pa. Super. 2013) (emphasis added). Failure to identify what specific elements the Commonwealth failed to prove at trial in a Rule 1925(b) statement renders an appellant's sufficiency-of-the-evidence claim waived for appellate review. *Id*. Thus, we conclude that Appellant's claim assailing the sufficiency of the evidence is waived.

Even if the issue was not waived, we would find it lacks merit. The relevant statute setting forth the crime of incest is as follows:

§ 4302. Incest

**(a) General rule.**--Except as provided under subsection (b), a person is guilty of incest, a felony of the second degree, if that person knowingly marries or cohabits or has sexual intercourse with an ancestor or descendant, a brother or sister of the whole or half blood or an uncle, aunt, nephew or niece of the whole blood.

**(b) Incest of a minor.**--A person is guilty of incest of a minor, a felony of the second degree, if that person knowingly marries, cohabits with or has sexual intercourse with a complainant who is an ancestor or descendant, a brother or sister of the whole or half blood or an uncle, aunt, nephew or niece of the whole blood and:

(1) is under the age of 13 years; or

(2) is 13 to 18 years of age and the person is four or more years older than the complainant.

18 Pa.C.S. § 4302. Sexual intercourse includes, "[i]n addition to its ordinary meaning, . . . intercourse per os or per anus, with some penetration

- 5 -

however slight; emission is not required." 18 Pa.C.S. § 3101. Appellant asserts in his argument that "[t]he Commonwealth did not prove that [Appellant] and complainant were uncle/niece by the whole blood" or "that there was sexual intercourse between the parties." Appellant's Brief at 8, 9. We disagree.[5]

A.C. testified that Appellant was her uncle and her "mother's brother." N.T., 8/13/13, at 64–65. Mother testified that Appellant was her "brother" and the victim, A.C., was her "daughter." N.T., 8/15/13, at 19. No one testified that Appellant was Mother's half-brother or step-brother. Thus, it was reasonable to infer that Appellant and Mother had the same parents and that A.C. was Appellant's niece "of the whole blood." **See Commonwealth v. Slocum**, 86 A.3d 272, 275 (Pa. Super. 2014) ("The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence."). Moreover, when reviewing a sufficiency claim, "our Court is required to give the prosecution the benefit of all reasonable inferences to be drawn from the evidence." **Id**. Thus, Appellant's first claim fails.

---

[5] Due to Appellant's vague and imprecise Rule 1925(b) statement, while the trial court analyzed the sufficiency of the evidence relating to incest generally, including the occurrence of sexual intercourse, **see** Trial Court Opinion, 2/26/15, at 17–18, it did not address the specific challenge concerning the relationship between A.C. and Appellant.

Appellant's second issue asserts that the trial court erred in admitting evidence that Appellant had been convicted of the attempted rape of T.J., his daughter, when she was eight years old, in violation of Pa.R.E. 404(b).[6] In his third issue, Appellant avers that the trial court permitted inadmissible hearsay evidence.[7]

Our review of the complete record, the arguments of the parties, and the applicable law, compels our conclusion that Appellant's issues lack merit, and the trial court correctly and comprehensively addressed them.[8] Accordingly, we affirm the judgment of sentence, and we do so on the basis of the thirty-one-page opinion of the Honorable Genece E. Brinkley filed on

---

[6] Appellant fails to explain that there apparently was a pretrial ruling on the issue, fails to note the rescission and replacement of Pa.R.E. 404 (effective March 18, 2013), and fails to cite to the current version of Rule 404. Moreover, while the docket entries note that the trial court's order of July 23, 2013, granting the Commonwealth's motion *in limine* to present evidence of Appellant's prior conviction of the attempted rape of T.J., the order is not in the record certified on appeal.

[7] Once again, Appellant failed to delineate in his Pa.R.A.P. 1925(b) statement the specific evidence he alleged was inadmissible hearsay, citing solely to a page of a transcript modified by "*et seq.*" This is not sufficient detail as contemplated by Rule 1925. Nevertheless, we do not find the issue waived.

[8] We note that **Commonwealth v. Hacker**, 959 A.2d 380 (Pa. Super. 2008), cited by the trial court at page twenty-three of its opinion, was reversed on grounds other than the proposition for it was cited, **Commonwealth v. Hacker**, 15 A.3d 333 (Pa. 2011).

February 26, 2015.[9]    We add only that the one additional argument presented by Appellant under issue one is belied by the record, as previously discussed.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/6/2015

---

[9]  The parties are directed to attach a copy of that opinion in the event of further proceedings in this matter.

# IN THE COURT OF COMMON PLEAS
## FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
### CRIMINAL TRIAL DIVISION

| | | |
|---|---|---|
| **COMMONWEALTH** | : | CP-51-CR-0006608-2012 |
| | | CP-51-CR-0006609-2012 |
| | **FILED** | CP-51-CR-0004492-2012 |
| **vs.** | FEB 26 2015 | |
| | Criminal Appeals Unit First Judicial District of PA | |
| **KIRK CARRINGTON** | : | **SUPERIOR COURT** 3127 EDA 2014 |

**BRINKLEY, J.**                                **FEBRUARY 26, 2015**

### OPINION

Defendant Kirk Carrington appeared before this Court for a jury trial and was found guilty of incest, endangering the welfare of a child (EWOC), and contempt for violation of a protection from abuse order. This Court sentenced Defendant to 4 to 8 years state incarceration on the incest charge and 2½ to 5 years state incarceration on the EWOC charge, to run consecutively to the incest charge. This Court imposed no further penalty on the contempt charge. Defendant was thus sentenced to a total aggregate term of 6½ to 13 years state incarceration. Defendant appealed this judgment of sentence to the Superior Court and raised the following issues on appeal: (1) whether the evidence was sufficient to find Defendant guilty of incest and EWOC; (2) whether the verdict was against the weight of the evidence; (3) whether this Court erred when it allowed the Commonwealth to introduce evidence of Defendant's prior bad acts; (4) whether this Court improperly admitted hearsay into evidence; (5) whether this Court erred when it permitted the Commonwealth to introduce a statement made by Defendant

1

without giving defense counsel prior notice; and (6) whether this Court erred when it permitted a Commonwealth witness to testify that he completed an affidavit of probable cause against Defendant.

## PROCEDURAL HISTORY

On March 9, 2012, Defendant was arrested and charged with rape, attempted rape, involuntary deviate sexual intercourse (IDSI), unlawful contact with a minor, aggravated indecent assault, indecent assault, incest, EWOC, contempt for violation of a protection order, and violations of Megan's Law.

From August 13, 2013 to August 16, 2013, a trial was held in the presence of a jury. On August 19, 2013, Defendant was found guilty of incest, EWOC, contempt, and the violations of Megan's Law. On November 15, 2013, the Sex Offender Assessment Board conducted an assessment of Defendant and found him to be a sexually violent predator. This Court agreed with that finding. On October 2, 2014, the jury's finding of guilty on the charges of failure to comply with the registration requirement and failure to provide accurate information was vacated by agreement after Megan's Law III was found to be unconstitutional. On that same day, this Court sentenced Defendant to 4 to 8 years state incarceration on the incest charge, and 2½ to 5 years state incarceration on the EWOC charge, to run consecutively to the sentence on the incest charge. This Court imposed no further penalty on the contempt charge. Defendant was therefore sentenced to a total aggregate sentence of 6½ to 13 years state incarceration.

On October 31, 2014, Defendant, through counsel, filed a notice of appeal to the Superior Court. On January 12, 2015, after receiving the notes of testimony, this Court ordered defense counsel to file a Concise Statement of Errors Complained of on Appeal Pursuant to Pa. R.A.P. 1925(b), and defense counsel did so on January 23, 2015.

2

## FACTS

The jury trial began in this matter on August 13, 2013. Defendant was represented at trial by Thomas Burke, Esquire, while the Commonwealth attorney was Kristen Kemp, Esquire. The Commonwealth's first witness was Officer Denise Downs ("Downs"). Downs testified that she had been a police officer for approximately five years and was currently assigned to the 12th District. Downs testified that on February 24, 2012, she responded to a call of an individual violating a protection from abuse order at 5461 Thomas Avenue. Downs further testified that she arrived at that location, where she met with the complainant, A.C. Downs stated that A.C. appeared very frightened and withdrawn. Downs testified that A.C. told her that she had an active protection order against her uncle, Defendant. Downs further testified that A.C. told Downs that she was coming home from work when she saw Defendant sitting on the steps of a house directly across the street from her own house. Downs stated that Defendant was not present when she arrived at the scene. Downs testified that A.C. further told Downs that she called her brother because she was scared. Downs stated that A.C.'s brother, Anrico C. ("Anrico") was present when she arrived on the scene. Downs testified that Anrico told her that Defendant had come to the house to retrieve something, but he was not allowed to be there. Downs further testified that she then transported A.C. to Southwest Detectives. Downs stated that she was not told the reason for the protection order at that time, but was later notified by Detective James Anderson ("Anderson"). (N.T. 8/13/2013 p. 44-50).

The Commonwealth called A.C. as its next witness. A.C. testified that Defendant was her uncle. A.C. further testified that Defendant was the main male presence in her life during her childhood, as her father was often absent. A.C. testified that Defendant molested her at her home address of 5461 Thomas Avenue, as well as her grandmother's address at 5232 Greenway

3

Avenue. A.C. described her grandmother's house as a three-bedroom house where various family members, including Defendant, lived. A.C. testified that she never lived at that address, but she would visit. Id. At 63-67.

A.C. testified that Defendant first molested her at the Greenway address. A.C. stated that she was in the kitchen with Defendant when he tried to place his penis in her mouth. A.C. testified that Defendant's penis penetrated her lips and touched her teeth, which she had clenched. A.C. further testified that Defendant also placed his hand in between her pants and her underwear and touched her vaginal area with his fingers. A.C. testified that Defendant touched the outer part of her vagina, but his fingers did not touch the inner part of her vagina. A.C. stated that she was at most five years old when this happened. A.C. testified that there was one other incident between her and Defendant that occurred at the Greenway address. A.C. testified that this incident occurred in Defendant's bedroom, which was located on the second floor of the house near the front of the building. A.C. stated that Defendant had a safe in his room and, on this particular occasion, she was trying to open the safe when Defendant approached her from behind and started to touch her back and chest. A.C. testified that she was not sure how old she was when this happened. Id. At 68-72.

A.C. testified that she lived with her mother, Estelle C. ("Estelle"), at the Thomas Avenue address. A.C. further testified that her family, including Defendant, would watch movies at the house. A.C. testified that Defendant would sit beside her on the couch while they watched these movies. A.C. stated that the two of them would sit underneath a blanket and Defendant would touch her chest and vagina underneath the blanket. A.C. further stated that sometimes other family members would be present while Defendant touched her. A.C. testified that Defendant's fingers penetrated the outer part of her vagina, but did not penetrate the inner

4

part of her vagina. A.C. further testified that Defendant touched her in this manner on more than one occasion. Id. At 72-75.

A.C. testified that the last time Defendant molested her was in the back bedroom on the second floor of the Thomas Avenue address. A.C. testified that on that occasion Defendant behaved more aggressively than normal and tried to take off her pants. A.C. further testified that she was scared because she thought Defendant wanted to go further than he usually did. A.C. stated she cried and repeatedly asked Defendant why he would do this to her, but he did not respond in any manner. Id. at 75-77.

A.C. testified that she was born on August 22, 1984. A.C. testified that the first person she told was Estelle. A.C. stated that she was no more than 14 years old when she told Estelle. A.C. testified that she told Estelle after the two of them watched a talk show in which a young woman discussed her sexual abuse at the hands of a family member. A.C. testified that she started to cry while watching the show, which caused Estelle to ask her what was wrong. A.C. further testified that initially she would not tell Estelle what had happened but, after Estelle persisted in asking her, she told Estelle that Defendant had sexually abused her. A.C. testified that she was scared when she told Estelle, because she was aware that the family had spoken negatively about her cousin, T.J., after T.J. had accused Defendant of sexual abuse. A.C. stated that she told Estelle that she would kill herself if Estelle told anyone. A.C. further stated that she refused to let Estelle call the police. Id. at 79-83.

A.C. testified that she later told her younger sister, Arianna C. ("Arianna"), after Defendant began spending more time at the family house. A.C. testified that she was afraid for Arianna's safety and so she told Arianna what had happened to her. A.C. further testified that she increasingly would visit the house, including staying overnight, to make sure that Arianna

5

was safe. A.C. testified Defendant moved into the Thomas Avenue address in 2011. A.C. further testified that, at around the same time, she told her brother, Anrico C. ("Anrico"). A.C. testified that Anrico was upset because he felt that Arianna was behaving rudely towards Defendant. A.C. stated that she told Anrico that Arianna was behaving in that manner because of what Defendant had done to A.C. When Anrico asked A.C. what Defendant had done to her, she told him. A.C. further testified that Anrico decided that the family would have a meeting, with Defendant present, to discuss the allegations made by A.C. Id. at 84-87.

A.C. testified that Defendant was made aware at the meeting that A.C. had told other family members what he had done to her. A.C. further testified that, after the meeting, she talked with T.J. and, as a result of that conversation, she obtained a protection from abuse order against Defendant. The Commonwealth then read a stipulation, by and between counsel, that the protection from abuse order became effective on November 29, 2011 and remained in effect until November 28, 2014. A.C. testified that she specified to police that she obtained the order "because of threats [Defendant] made at a previous time and because of the things from the past." A.C. further testified that the order formally evicted Defendant from the Thomas Avenue address even though Defendant already had moved out of the home by the time she obtained the order and that Defendant was made aware of the order. There was a further stipulation, by and between counsel, that Defendant's signature appeared on the order as having notice of the order. Id. at 102-09.

A.C. testified that she was on her way to the Thomas Avenue address on February 24, 2012 when she saw Defendant coming out of the house. A.C. further testified that she immediately called Anrico because she was scared. A.C. stated that Anrico told her to go across the street to a neighbor's house and call the police. A.C. testified that she saw Defendant leave

6

the scene shortly after he saw her, and he was no longer present when the police arrived. A.C. further testified that she told the police what had happened. A.C. testified that she was then transported to Southwest Detectives, where she spoke with Anderson. A.C. stated that she told Anderson about the protection order she had obtained against Defendant, and the reason for the protection order. A.C. testified that, at that time, she told Anderson what Defendant had done to her. A.C. testified that she was then transported to the Special Victims Unit, where she spoke with Officer Meissler ("Meissler"). Id. at 110-16.

The Commonwealth called T.J. as its next witness. T.J. testified that Defendant was her father. T.J. testified that, when she was eight years old, she visited Defendant at the Greenway Avenue address. T.J. testified that, while she was visiting Defendant, he touched the outside of her vaginal and anal regions with his penis. T.J. stated that she had been playing video games in the back bedroom on the second story of the house when Defendant began to molest her. T.J. testified that Defendant did not touch any other part of her body or say anything to her. T.J. further testified that she told her mother what had happened. T.J. testified that Defendant only touched her that one time. T.J. stated that her cousins, including A.C., would visit the Greenway Avenue address. (N.T. 8/14/2013 pg. 22-28).

T.J. stated that she testified at trial against Defendant. T.J. further stated that other members of her family, including Estelle, came to the trial and supported Defendant. T.J. testified that Defendant was found guilty of attempted rape at the trial, and was sent away for a period of time. T.J. further testified that she later reinitiated contact with Defendant because she wanted to forgive him. T.J. stated that she did not find out about the accusations made by A.C. until later. T.J. testified that she talked to Defendant about A.C. T.J. stated that at that time Defendant threatened to kill A.C. and her family. T.J. further stated that Defendant repeated this

7

threat on more than one occasion. T.J. testified that these threats made her feel worried and she told A.C. and her family about them. Id. at 28-33.

The Commonwealth called Anrico as its next witness. Anrico testified that Defendant was his uncle and had been a father figure to him. Anrico further testified that A.C. was his sister and T.J. was his cousin. Anrico testified that, when Defendant was on trial for the attempted rape of T.J., the other members of the family would talk about T.J. and would say that T.J. was lying, that she had been put up to it by her mother. Anrico further testified that the family supported Defendant and did not believe that he was guilty, even after he was convicted. Anrico stated that A.C. was present during some of these conversations. Id. at 55-68.

Anrico testified that he later noticed a change in Arianna's behavior towards Defendant. Anrico stated that Arianna seemed more aggressive and uncomfortable around Defendant and that her behavior upset him, because he was close with Defendant. Anrico testified that he discussed the situation with A.C. and asked her why Arianna was behaving in that manner, at which point A.C. started to cry. Anrico testified that he asked A.C. why she was crying, and she eventually told him what had happened to her. Anrico further testified that he suggested to A.C. that the family have a conversation with her and Defendant present. Anrico testified that he was present at the family meeting, during which A.C. said that Defendant had made threats against her. Anrico testified that he confronted Defendant about those threats after the family meeting was over. Anrico testified that Defendant acknowledged making threats that he would kill A.C. and her family, including Anrico. Id. at 68-72, 95.

Anrico testified that on February 24, 2012, he was at the Thomas Avenue address when Defendant knocked on the door and he opened it, at which point Defendant walked past him into the house. Anrico testified that he asked Defendant what he was doing at the house, and

8

Defendant said to him, "Don't question me...Don't ever question me on what I'm doing or why I'm here." Anrico testified that he then went across the street to a neighbor's house, where he called A.C. and warned her that Defendant was at their house. Anrico further testified that when A.C. arrived on the scene, Defendant was outside sitting on the stoop area of the house. Anrico stated that A.C. appeared scared and nervous. Anrico testified that he called Estelle, who told them to call the police. Anrico stated that they called the police and waited in their neighbor's house until the police arrived. Anrico testified that Defendant was not present when the police arrived. Anrico further testified that Defendant's bike was parked near the stoop of the house, and was not inside the house. Anrico stated that he never told Defendant to come and get his bike, and he did not invite Defendant into the house when Defendant knocked on the door. Id. at 95-99.

The Commonwealth called Arianna as its next witness. Arianna testified that A.C. was her older sister, and Defendant was her uncle. Arianna stated that she did not remember whether she knew her uncle prior to 1996. Arianna testified that, sometime around 2011, she had a conversation with A.C. about Defendant. Arianna testified that A.C. told her to be aware of her safety and surroundings. Arianna further testified that when she asked A.C. why she said this, A.C. told Arianna that Defendant had abused her and that she did not want the same to happen to Arianna. Arianna further testified that A.C. began to visit her more often at the house to ensure that she was okay. Arianna stated that, after this conversation with A.C., she became more distant towards Defendant. Arianna further stated that the family considered her behavior towards Defendant to be disrespectful, but she did not tell anyone about her reason since A.C. had asked her to keep their discussion private. Arianna testified that Anrico was especially upset with how she behaved towards Defendant. Arianna further testified that Anrico talked to A.C.

9

about Arianna, at which time A.C. told Anrico what had happened to her previously. (N.T. 8/15/2013 p. 9-12).

The Commonwealth called Estelle as its next witness. Estelle testified that Defendant was her brother, and A.C. was her daughter. Estelle testified that she attended Defendant's 1996 trial and supported him throughout the proceedings. Estelle further testified that she and other family members would talk about T.J. in front of A.C. Estelle stated that they would discuss their belief that Defendant had been set up by T.J.'s mother. Estelle testified that she continued to support Defendant even after he was found guilty, through the early stages of his incarceration. Estelle stated that she would send him letters, phone him, and visited him in prison one time. Estelle testified that, prior to 1996, Defendant lived at their mother's house at Greenway Avenue. Estelle further testified that she brought her children over to that house quite often when Defendant was present. Estelle testified that the children would sometimes spend the night at that house. Id. at 18-24.

Estelle testified that she lived at the Thomas Avenue address and that Defendant regularly visited that address from 1990 to 1996. Estelle testified that the family, including Defendant, would often watch movies together at that address. Estelle testified that one day she watched a television program with A.C. in which a young woman described being molested by her uncle. Estelle further testified that she and other members of the family began to make derogatory remarks about the young woman, at which point A.C. started crying and ran out of the room. Estelle testified that she realized something was wrong with A.C. and she followed A.C. to her bedroom. Estelle further testified that she asked A.C. who had abused her, and A.C. initially refused to tell her. Estelle stated that A.C. told her, "Nobody would believe me because he's such a good guy. He's such a good guy and everybody is going to hate me." Estelle

10

testified that she then asked A.C. if it was Defendant and A.C. replied, "Yes, but you can't tell anybody because everybody is going to hate me. They [are] not going to believe me. Nobody [believed T.J.], they not going to believe me." Estelle testified that A.C. threatened to kill herself if she told anyone. Estelle testified that she was unsure how old A.C. was when she told Estelle what had happened to her, but she was not older than 15 years old. Id. at 24-28.

Estelle testified that she stopped communicating with Defendant after A.C. told her what he had done. Estelle testified that Defendant moved to Maryland and then to Georgia after being released from custody in 2007, but he returned to Philadelphia sometime prior to 2011. Estelle stated that Defendant initially lived with her sister in Philadelphia, before he moved into an apartment of his own. Estelle testified that she later allowed Defendant to stay with her because he had lost his apartment and would have had to live in a shelter. Estelle further testified that she wanted to forgive him and believed that he could be reintegrated into the family. Estelle stated that, before Defendant began to live at her house, A.C. did not come over to her house very often and visited her only on special occasions. Estelle testified that A.C. began to visit the house every day after Defendant moved in. Estelle testified that A.C. appeared distressed that Defendant was living at the house and told Estelle that she was afraid for Arianna's safety. Estelle testified that she then suggested to A.C. that the family have a meeting to address the allegations she made against Defendant. Estelle further testified that, after the meeting occurred, she found out that A.C. subsequently obtained a protection from abuse order against Defendant. Estelle testified that she did not ask Defendant to pick up his bike from her house, nor did he have permission to pick up the bike. Id. at 29-34.

The Commonwealth then read a stipulation, by and between counsel, that Defendant was convicted by a jury on June 20, 1997 of attempted rape, indecent assault and corrupting the

11

morals of a minor (CMOM). Based on that conviction, Defendant was required to register for life as a sex offender. The registration requirements required Defendant to register any address that he was residing in, as well as if he moved or left the state. Defendant was further required to report any change in his registration within 48 hours of moving and to register once a year to update his information. Id. at 75.

There was a further stipulation, by and between counsel, that if Trooper Kohinsky ("Kohinsky") of the Pennsylvania State Police were called to testify, he would testify that he was custodian of records for the purposes of Megan's Law registration and he had a duty of care to accurately keep proper records of registrants. Kohinsky would further testify that Defendant was released from custody in 2007 and registered to the Greenway Avenue address. Kohinsky would testify that Defendant's registration would remain unchanged until February 2009, when Defendant changed his address to Apartment 1, Angora Terrace in Philadelphia. Kohinsky would further testify that that residence remained in effect until Defendant registered to the Thomas Avenue address in August 2011. Kohinsky would testify that Defendant had not registered any new or additional addresses at the time he was arrested on March 9, 2012. Id. at 74-77.

There was a further stipulation, by and between counsel, that if a police officer from the Special Victims Unit was called to testify, he or she would testify that, based on the preceding information, they obtained an affidavit of probable cause as well as an arrest warrant against Defendant for the violations of Megan's Law. There was a further stipulation, by and between counsel, that the warrant was executed on March 9, 2012, and Defendant reported his address at that time as 4993 Thompson Street, an address that had not been registered with the Pennsylvania State Police. Id. at 77-78.

12

The Commonwealth called Anderson as its next witness. Anderson testified that he had been assigned to Southwest Detectives since 2002, and had been a police officer for 17 years. Anderson testified that he was assigned to investigate the alleged violation of the protection from abuse order. Anderson further testified that he interviewed and took statements from A.C. and Anrico in the course of his investigation. Anderson testified that he verified that there was a valid protection order against Defendant and, based on that information, he prepared an affidavit of probable cause for the violation of the protection order. Anderson further testified that he asked A.C. why she had obtained a protection from abuse order against Defendant. Anderson testified that A.C. told him that she was molested by Defendant when she was five years old. Anderson stated that he then asked if Defendant was ever arrested for molesting her, and A.C. responded that he had not but he had been arrested for molesting his daughter. Anderson testified that he transported A.C. to the Special Victims Unit after he interviewed her. Id. at 79-81, 93-95.

The Commonwealth called Meissler as its next witness. Meissler testified that he had been assigned to the Special Victims Unit for 14 years, and had been a police officer for 27 years. Meissler testified that he was assigned to investigate the sexual abuse allegations made by A.C. against Defendant. Meissler testified that he interviewed and took a statement from A.C. in the course of his investigation. Meissler stated that, based on the information he obtained from A.C., he completed an affidavit of probable cause and an arrest warrant for Defendant. Meissler testified that he personally served the arrest warrant on Defendant. Meissler testified that Defendant was arrested at 4993 Thompson Street and that Defendant gave that address as his residence. Id. at 97-101. The Commonwealth then read a stipulation, by and between counsel,

13

that Defendant's date of birth was March 12, 1962. Id. at 110. The Commonwealth then rested. Id.

The defense called Estina Corker ("Corker") as its first witness. Corker testified that Defendant was her uncle. Corker further testified that A.C. was her first cousin. Corker stated that, between 1985 and 1990, she lived at the Thomas Avenue address with her extended family, including Defendant and A.C. Corker testified that, in 1991, she moved with her mother to the Greenway Avenue address, where her grandmother and Defendant were living at the time. Corker stated that Defendant lived in the downstairs living room. Corker further stated that she and Defendant remained in the house until 1996. Corker testified that Defendant worked five days a week on overnight shifts. Corker testified that Estelle would only bring her children over to the Greenway Avenue address for special occasions, and did not bring them over on a regular basis. Corker further testified that she could not recall a time in which A.C. was by herself in the house. Corker stated that it was approximately a thirty minute walk from the Thomas Avenue address to the Greenway avenue address, and Estelle did not own a car at the time. Corker testified that Defendant never babysat Estelle's children. Corker stated that she had a very close relationship with A.C. and that A.C. was like a sister to her. Id. at 115-21.

Corker testified that she moved to Georgia in 2005. Corker further testified that Defendant moved to Georgia to stay with her in 2007. Corker stated that Defendant lived with her in Georgia for approximately six weeks before he returned to Philadelphia. Corker testified that she would visit Philadelphia on special occasions for family gatherings. Corker further testified that she returned to Philadelphia in June 2011 for her wedding shower. Corker testified that Defendant, A.C., Anrico and Arianna were all present at her wedding shower. Corker stated that she returned to Philadelphia roughly two or three times per year, and she would often see

14

both Defendant and A.C. together at the Thomas Avenue address. Corker testified that A.C.'s demeanor around Defendant seemed normal, as though she enjoyed his company. Id. at 121-24.

Corker testified that A.C. lived with her in Georgia from September 2011 to October 2011. Corker stated that A.C. had planned on moving there permanently, but she left to visit Philadelphia and never returned. Corker testified that, in February 2012, she received a phone call from Estelle. Corker testified that Estelle told her that Defendant had a bike in front of her property and that it needed to be removed. Corker stated that Estelle asked Corker to get in contact with Defendant and have him remove the bike. Corker testified that she then called Defendant. Id. at 124-28.

The defense called Michelle Davis ("Davis") as its next witness. Davis testified that she lived on Thomas Avenue in the early 1990s with her mother and father. Davis testified that Estelle was her best friend at that time and that she lived down the street. Davis further testified that she knew A.C. through Estelle. Davis stated that she visited Estelle's house almost every day. Davis testified that Estelle would stay at home during the day, and her children went to school. Davis further testified that she could never recall Estelle taking her children to the Greenway Avenue address or talking about taking them to that location. Davis testified that Estelle did not drive at that time, and would have had to get a ride from somebody. Davis testified that she had visited the Greenway Avenue address on two occasions, and Estelle's children were not present at those times. Davis testified that she knew Defendant through his family and that she attended Corker's bridal shower. Davis stated that Defendant, A.C. and Arianna also attended the bridal shower, and she had a conversation with all three of them. Davis testified that the conversation lasted approximately 30 minutes, and A.C. and Defendant

15

were both laughing and joking. Id. at 170-74. After Davis's testimony, the defense rested. Id. at 189.

## ISSUES

I.  WHETHER THE EVIDENCE WAS SUFFICIENT TO FIND DEFENDANT GUILTY OF INCEST AND ENDANGERING THE WELFARE OF A CHILD.

II. WHETHER THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE.

III. WHETHER THE COURT ERRED WHEN IT ALLOWED THE COMMONWEALTH TO INTRODUCE EVIDENCE OF DEFENDANT'S PRIOR BAD ACTS.

IV. WHETHER THE COURT IMPROPERLY ADMITTED HEARSAY INTO EVIDENCE.

V.  WHETHER THE COURT ERRED WHEN IT ALLOWED THE COMMONWEALTH TO INTRODUCE A STATEMENT MADE BY DEFENDANT WITHOUT GIVING THE DEFENSE PRIOR NOTICE.

VI. WHETHER THE COURT ERRED WHEN IT PERMITTED A COMMONWEALTH WITNESS TO TESTIFY THAT HE COMPLETED AN AFFIDAVIT OF PROBABLE CAUSE.

## DISCUSSION

I.  THE EVIDENCE WAS SUFFICIENT TO FIND DEFENDANT GUILTY OF INCEST AND ENDANGERING THE WELFARE OF A CHILD.

The evidence presented at trial was sufficient to find Defendant guilty of incest and endangering the welfare of a child (EWOC).

### 1. Sufficiency of the Evidence.

A review of the sufficiency of the evidence to support a conviction requires that the evidence be reviewed in the light most favorable to the Commonwealth as verdict winner. Commonwealth v. Walter, 2004 PA Super. 147, 849 A.2d 265, 267 (2004) (citing Commonwealth v. Rose, 463 Pa. Super. 264, 344 A.2d 824, 825 (1975)). The Commonwealth is

16

also entitled to all favorable inferences which may be drawn from the evidence. Commonwealth v. Sanchez, 2006 Pa. LEXIS 1833 (2006) (citing Commonwealth v. Collins, 550 Pa. 46, 50, 703 A.2d 418, 420 (1997)). The evidence put forth by the Commonwealth will be considered sufficient if it establishes each material element of the crime beyond a reasonable doubt, even if by wholly circumstantial evidence. Commonwealth v. Dargan, 2006 PA Super. 74, 897 A.2d 496, 503 (2006) (citing Commonwealth v. DiStefano, 2001 PA Super. 238, 782 A.2d 574, 582 (2001)).

When determining whether the evidence is sufficient to support a guilty verdict, the appellate court must examine the entire trial record and consider all of the evidence actually received. Id. However, the trier of fact is entitled to believe all, part or none of the evidence received at trial and the appellate court cannot substitute its judgment for that of the fact-finder. Commonwealth v. Frisbie, 2006 PA Super. 430, 889 A.2d 1271, 1274 (2006) (citing DiStefano, 782 A.2d at 574); Commonwealth v. Kim, 2005 PA Super. 383, 888 A.2d 847, 851 (2005) (citing Commonwealth v. Champney, 574 Pa. 435, 832 A.2d 403, 408 (2003)). The facts and circumstances established by the Commonwealth need not eliminate any possibility of the defendant's innocence; rather, any doubt is to be resolved by the fact-finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact could be concluded. Commonwealth v. Lambert, 2002 PA Super. 82, 795 A.2d 1010 (2002) (citing Commonwealth v. Cassidy, 447 Pa. Super. 192, 194, 668 A.2d 1143, 1144 (1995)).

### 2. The evidence was sufficient to convict Defendant of incest.

The evidence presented at trial was sufficient to convict Defendant of incest. A person is guilty of committing incest of minor if that person knowingly marries, cohabits with, or has sexual intercourse with a complainant who is an ancestor or descendant, a brother or sister of the

17

whole or half blood or an uncle, aunt, nephew or niece of the whole blood, and the complainant is either under 13 years old or is between the ages of 13 to 18 and the person is 4 or more years older than the complainant. 18 Pa.C.S.A. § 4302(b). The statutory definition of sexual intercourse for purposes of sexual offenses is equally applicable for incest. Commonwealth v. Fouse, 417 Pa. Super. 534, 612 A.2d 1067, 1069-70 (1992). Sexual intercourse is defined, in addition to its ordinary meaning, as "intercourse per os or per anus, with some penetration however slight; emission is not required." Commonwealth v. Chorlton, 2006 PA Super 149, 902 A.2d 554, 561 (2006). As with other sexual offenses, the uncorroborated testimony of the victim, if believed by the trier of fact, is sufficient to convict a defendant of incest, despite contrary evidence from defense witnesses. Id. at 562.

In the case at bar, A.C. testified that she was Defendant's niece, and that her mother was Defendant's sister. A.C. further testified that Defendant inserted his penis into her mouth on one occasion when she was approximately five years old. A.C. testified that Defendant's penis went past her lips until it touched her teeth. A.C.'s testimony was corroborated by the testimony of Estelle, who testified that A.C. became distressed when she watched a talk show in which a young woman described the sexual abuse she suffered as a child at the hands of her uncle. Furthermore, Estelle, Arianna and Anrico each testified that A.C. would become very upset when she would discuss what Defendant had done, and Estelle testified that A.C. tried to commit suicide after she told Estelle. In addition, Defendant was four or more years older than A.C. The testimony of A.C. was sufficient in itself to find Defendant guilty of incest if deemed credible by the jury. The jury found that A.C.'s testimony was credible, and therefore the evidence was sufficient to find Defendant guilty of incest.

18

### 3. The evidence was sufficient to convict Defendant of Endangering the Welfare of a Child

The evidence presented at trial was sufficient to convict Defendant of endangering the welfare of a child (EWOC). A parent, guardian or other person supervising the welfare of a child under 18 years of age commits the crime of EWOC when he or she knowingly endangers the welfare of the child by violating a duty of care, protection or support. 18 Pa.C.S.A. § 4304. Pennsylvania courts have established a three-prong test that must be satisfied to prove EWOC; first, the accused must be aware of his or her duty to protect the child, secondly, the accused was aware that the child was in circumstances that could threaten the child's physical or psychological welfare, and, thirdly, the accused has either failed to act or has taken action so lame or meager that such actions cannot reasonably be expected to protect the child's welfare. Commonwealth v. Bryant, 2012 PA Super 257, 57 A.3d 191, 197 (2012) (citing Commonwealth v. Pahel, 456 Pa. Super. 159, 689 A.2d 963, 964 (1997)). As with other sexual offenses, the uncorroborated testimony of the victim, if believed by the trier of fact, is sufficient to convict a defendant of EWOC. Commonwealth v. Trippett, 2007 PA Super. 260, 932 A.2d 188, 201 (2007) (citing Chorlton, 902 A.2d at 562).

In the case at bar, A.C. testified that Defendant placed his penis into her mouth on one occasion when she was approximately 5 years old and thereafter touched her vagina, breasts and buttocks with his hands on multiple occasions until she was approximately 12 years old. A.C. testified that, on the last occasion in which Defendant molested her, she believed that he was going to attempt to penetrate her vagina with his penis. A.C. testified that Defendant behaved more aggressively than usual, which frightened her, and she started to cry and ask him why he molested her. A.C. further testified that Defendant was unresponsive when he molested her, and would continue to molest her even after she communicated her distress to him. A.C. testified

19

that some of the incidents occurred when Defendant was babysitting her, and that Defendant was a father-figure to her because he had assumed the responsibility of caring for her when she was a child. The evidence therefore showed that Defendant was aware of his duty to protect A.C., that his own actions placed A.C. in considerable physical and psychological distress, and that he not only failed to take any actions to protect A.C.'s welfare but he persisted in taking actions that endangered A.C.'s welfare. Consequently, the evidence was sufficient to find Defendant guilty of EWOC.

## II. THE VERDICT WAS NOT AGAINST THE WEIGHT OF THE EVIDENCE.

The verdict in this case was not against the weight of the evidence presented at trial. Under Pennsylvania law, a weight of the evidence claim concedes that the evidence was sufficient to sustain the verdict. Commonwealth v. Smith, 2004 PA Super. 77, 853 A.2d 1020, 1028 (2004) (citing Commonwealth v. Bennett, 2003 PA Super. 212, 827 A.2d 469 (2003)). The weight of the evidence is "exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses." Commonwealth v. Rice, 2006 PA Super. 143, 902 A.2d 542, 546 (2006) (quoting Commonwealth v. Champney, 574 Pa. 435, 832 A.2d 403, 408 (2003)). In addition, "where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence, ... rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim." Commonwealth v. Kim, 2005 PA Super. 383, 888 A.2d 847, 851 (2005) (quoting Champney, 832 A.2d at 408). An appellate court cannot substitute its judgment for that of the fact finder; therefore, a verdict will be reversed only in the extraordinary situation where the jury's verdict is "so contrary to the evidence as to shock one's sense of justice" and the award of a new trial is imperative so that

20

right may be given another opportunity to prevail. Commonwealth v. Tharp, 574 Pa. 202, 830 A.2d 519, 528 (2003) (citing Commonwealth v. Brown, 538 Pa. 410, 648 A.2d 1177, 1189, (1994)); Commonwealth v. Smith, 580 Pa. 392, 861 A.2d 892, 896 (2005) (citing Commonwealth v. Drumheller, 570 Pa. 117, 808 A.2d 893, 908 (2002)).

In the case at bar, the verdict determined by the jury was supported by the evidence presented at trial. The jury heard testimony from A.C. which was voluminous and specific about what Defendant had done to her. This testimony was consistent with what A.C. previously had described to family members and the police. Furthermore, the testimony was corroborated by the testimony of the other witnesses, including her family members. A.C. testified that Defendant would often touch her vagina while the two of them would sit underneath a blanket and watch horror movies together. A.C. testified that other family members would sometimes be present while Defendant did this to her. Estelle testified that the family would frequently watch horror movies together, and Defendant and A.C. would often be present on these occasions. T.J. testified that Defendant molested her in a similar manner at the same address where A.C. testified she had been molested by Defendant. The jury's verdict was thus not so contrary to the evidence as to shock one's sense of justice. Therefore, the verdict was not against the weight of the evidence and this Court's decision should not be disturbed on appeal.

## III. THE COURT DID NOT ERR WHEN IT ALLOWED THE COMMONWEALTH TO INTRODUCE EVIDENCE OF DEFENDANT'S PRIOR BAD ACTS.

This Court did not err when it allowed the Commonwealth to introduce evidence that Defendant previously was convicted of attempted rape. It is well established that the admissibility of evidence is solely within the discretion of the trial court and its decision will not be disturbed on appeal absent an abuse of that discretion. An abuse of discretion is not merely

21

an error of judgment, but is rather the overriding or misapplication of the law or an exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record. Commonwealth v. Wattley, 2005 PA Super. 272, 880 A.2d 682, 685 (2005) (quoting Commonwealth v. Dent, 837 A.2d 571, 577 (PA Super. 2003)). Where the trial court has stated a "reason for its decision, the scope of review is limited to an examination of the stated reason." Commonwealth v. O'Brien, 2003 PA Super. 425, 836 A.2d 966, 968 (2003)(quoting Commonwealth v. Horvath, 2001 PA Super. 227, 781 A.2d 1243, 1246 (2001); Commonwealth v. Minerd, 562 Pa. 46, 753 A.2d 225, 229 (2000)). "A discretionary rule cannot be overturned simply because a reviewing court disagrees with the trial court's conclusion." Id. (quoting Commonwealth v. Cohen, 529 Pa. 552, 605 A.2d 1212, 1218 (1992)). To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party. Commonwealth v. Lopez, 2012 PA Super 161, 57 A.3d 74, 81 (2012) (citing McNanamon v. Washko, 906 A.2d 1259, 1268-69 (Pa.Super.2006)). An evidentiary error of the trial court will be deemed harmless on appeal where the appellate court is convinced, beyond a reasonable doubt, that the error could not have contributed to the verdict. Commonwealth v. DeJesus, 584 Pa. 29, 880 A.2d 608, 614 (2005) (citing Commonwealth v. Story, 476 Pa. 391, 383 A.2d 155, 164-66 (1979)).

Under Pennsylvania Rule of Evidence 404(b), evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. Pa.R.E. 404(b). However, this evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair

22

prejudice. Id. Furthermore, the importance of the intervening time period is inversely proportional to the similarity of the crimes in question. Commonwealth v. Einhorn, 2006 PA Super 322, 911 A.2d 960, 967 (2006) (citing Commonwealth v. Miller, 541 Pa. 531, 664 A.2d 1310, 1319 (1995)). Moreover, evidence of a common scheme, plan or design involving various similarly situated victims can be admissible to bolster the credibility of the complainant. *See* Commonwealth v. O'Brien, 2003 PA Super 425, 836 A.2d 966, 970 (2003); *see also* Commonwealth v. Hacker, 2008 PA Super 239, 959 A.2d 380, 393 (2008). In O'Brien, the defendant sought to challenge the accuracy of the victim's testimony regarding the sexual abuse he had suffered as a child, especially in light of the five year span between the assault and the victim's report to his therapist. The Superior Court held that evidence that Defendant had previously been convicted of abusing two other boys in a similar manner was properly admissible to show a common scheme, plan or design and therefore bolster the victim's credibility against the defense's attacks. O'Brien, 836 A.2d at 970-71.

In the case at bar, the evidence of Defendant's prior molestation of T.J. was properly admissible to show a common scheme, plan or design, and to rebut arguments made by the defense regarding the credibility of A.C. The facts of each offense were similar enough to each other to suggest a common scheme, plan or design. Both A.C. and T.J. were prepubescent, African-American females who were roughly the same age when Defendant abused them. Both A.C. and T.J. were abused contemporaneously with each other, and the abuse took place at the same address. A.C. and T.J. both shared a similar relationship with Defendant; Defendant was T.J.'s biological father, while A.C. described Defendant as a father-figure to her. In addition, the nature of the abuse itself was similar. T.J. testified that she was playing video games when Defendant suddenly approached her and rubbed his penis against the outer parts of her vagina

23

and anus. T.J. further testified that Defendant persisted in attempting to penetrate her vagina and anus with his penis even after he was initially unable to do so. A.C. testified that she was in the kitchen when Defendant suddenly approached her and rubbed his penis against the outer part of her mouth. A.C. further testified that Defendant persisted in attempting to penetrate her mouth with his penis even after he was initially unable to do so. A.C. and T.J. both testified that Defendant behaved in a similar manner while he abused them. Both A.C. and T.J. testified that Defendant would not say anything to them and was generally unresponsive to them while he abused them. Thus, the facts of each offense were similar enough that each would have been admissible in the other case to show a common scheme, plan or design. Furthermore, evidence of Defendant's prior bad acts was critical to corroborate A.C.'s testimony and to deflect the repeated attempts by defense counsel to attack her credibility. Throughout trial, defense counsel went to considerable lengths to attack A.C.'s credibility and suggest that she fabricated the allegations she made against Defendant. Furthermore, as A.C. did not report the abuse until many years later, her testimony was the sole direct evidence available to the Commonwealth to prosecute Defendant. Thus, evidence that Defendant had previously abused a similar girl in a similar manner was vital to deflect defense counsel's repeated attacks on A.C.'s credibility and corroborate her testimony. Therefore, this Court did not err when it allowed the Commonwealth to introduce evidence of Defendant's prior bad acts.

## IV. THE COURT DID NOT IMPROPERLY ADMIT HEARSAY INTO EVIDENCE.

This Court properly allowed the Commonwealth to introduce evidence of the conversations of A.C.'s family had regarding T.J. because the statements were not offered for the truth of the matter asserted therein but instead were relevant to explain A.C.'s course of conduct. Under Rules 801 and 802, an out-of-court statement is inadmissible as hearsay if it is being

24

offered to prove the truth of the matter asserted in the statement. Pa.R.E. 801, 802. An out-of-court statement is not hearsay when it has a purpose other than to convince the fact finder of the truth of the statement. Commonwealth v. Busanet, 618 Pa. 1, 54 A.3d 35, 56 (2012). A statement is not hearsay when it is offered to show the effect on the listener. Id. Any out of court statement offered to explain the witness's course of conduct is not hearsay. Commonwealth v. Johnson, 615 Pa. 354, 42 A.3d 1017, 1035 (2012) (citing Commonwealth v. Rega, 593 Pa. 659, 933 A.2d 997, 1017 (2007)).

In the case at bar, this Court properly allowed the Commonwealth to introduce out-of-court statements made by A.C.'s family to Anrico because the statements were not offered for the truth of the matter asserted in the statement, but were offered to show the effect on the listener and to explain A.C.'s course of conduct. Anrico testified that he was present when other members of his family discussed the allegations made by T.J. against Defendant. Anrico testified that the other members of the family, including Estelle, accused T.J. of lying about what Defendant had done to her and said that she had been put up to it by her mother. Anrico further testified that A.C. would sometimes be present during these conversations. The Commonwealth obviously would not offer these statements for the truth of the matter asserted therein, i.e. that T.J. had fabricated the allegations she made against Defendant. Rather, the Commonwealth offered these statements to show the effect that they had on A.C., and to explain A.C.'s course of conduct. A.C. previously testified that she did not initially report her abuse because she was afraid that the family would treat her like they had treated T.J. She further testified that, even after she told Estelle, she threatened to kill herself if Estelle reported the abuse to the police because of her fear that the family would treat her similarly. Thus, the statements made in the presence of A.C. by the family members, including Estelle, about T.J. were offered to show the

25

effect that they had on A.C. and to further explain her course of conduct. Therefore, this Court properly allowed the Commonwealth to introduce them into evidence because they were not hearsay.

## V. THE COURT DID NOT ERR WHEN IT PERMITTED THE COMMONWEALTH TO INTRODUCE A STATEMENT MADE BY DEFENDANT WITHOUT GIVING PRIOR NOTICE TO THE DEFENSE.

This Court did not err when it allowed the Commonwealth to introduce a statement made by Defendant to Anrico without giving prior notice to the defense. In all court cases, on request by the defendant, and subject to any protective order which the Commonwealth might obtain under this rule, the Commonwealth shall disclose to the defendant's attorney all of the following requested items or information, provided they are material to the instant case...(b) any written confession or inculpatory statement, or the substance of any oral confession or inculpatory statement, and the identity of the person to whom the confession or inculpatory statement was made that is in the possession or control of the attorney for the Commonwealth. Pa.R.Crim.P. 573. The Commonwealth does not violate Rule 573 when it fails to disclose to the defense evidence that it does not possess and of which it is unaware. Commonwealth v. Collins, 598 Pa. 397, 957 A.2d 237, 253 (citing Commonwealth v. Boczkowski, 577 Pa. 421, 846 A.2d 75, 97 (2004)). Moreover, a defendant seeking relief from a discovery violation must demonstrate prejudice. Commonwealth v. Hood, 2005 PA Super 93, 872 A.2d 175, 181 (2005) (citing Commonwealth v. Causey, 833 A.2d 165, 171 (Pa.Super.2003)).

In the case at bar, Anrico had begun to testify about the family meeting when defense counsel objected. This Court informed Anrico that it previously had ruled that witnesses could not discuss any admission or denial that Defendant may have made at the meeting regarding the sexual offenses. Anrico asked this Court if he would be able to testify that Defendant admitted

26

to Anrico immediately after the meeting that he made the threats against A.C. The Commonwealth then requested that this Court allow Anrico to testify that Defendant admitted to making the threats. The Commonwealth argued that defense counsel previously had opened the door to evidence that Defendant had made threats against A.C., and this was an admission of a party opponent which corroborated that evidence. Defense counsel argued that this was a statement by Defendant that he was entitled to have been given notice of in advance. This Court ruled that Anrico could testify that Defendant admitted to making the threats and allowed defense counsel to take an additional day to prepare for the testimony if he would prefer to do so. Defense counsel declined and, when trial resumed, Anrico testified that Defendant acknowledged making threats that he would kill A.C. and her family. (N.T. 8/14/2013 p. 72-95).

This Court properly allowed Anrico to testify that Defendant admitted to making the threats because the Commonwealth did not possess this information prior to Anrico's testimony and defense counsel was not prejudiced by the admission. As this Court noted, the evidence that Defendant admitted to Anrico that he made threats only came to light when Anrico himself asked whether he was permitted to talk about it. Furthermore, the Commonwealth did not possess this information because this Court previously had ruled that the threats Defendant had made would not be introduced into evidence. It was only when defense counsel opened the door to the threats on the day prior to Anrico's testimony that the Commonwealth was allowed to introduce evidence that Defendant had made the threats. The Commonwealth, therefore, was unaware of the admission prior to Anrico's testimony and had met their burden of disclosing that which was in their knowledge. In addition, Defendant was not prejudiced by the lack of disclosure prior to trial. As this Court further noted, that in her statement to the police, A.C. stated that she obtained the protection order because "[Defendant] moved into our house a couple years ago and I have a

27

younger sister who is 19 and I was afraid that he might have done something to her and I told her about what he did to me. [Anrico] found out and he confronted [Defendant] and [Defendant] began threatening me and my family." (N.T. 8/14/2013 p. 86-87). Defense counsel was not prejudiced by Anrico's testimony, therefore, because he had notice prior to trial that Anrico had confronted Defendant and Defendant subsequently threatened A.C. and her family. Anrico's testimony was thus merely corroborative of information defense counsel had prior notice of. Consequently, defense counsel was not prejudiced by the lack of disclosure prior to trial.

## VI. THE COURT DID NOT ERR WHEN IT PERMITTED A COMMONWEALTH WITNESS TO TESTIFY THAT HE COMPLETED AN AFFIDAVIT OF PROBABLE CAUSE.

This Court did not err when it allowed Anderson to testify that he completed an affidavit of probable cause against Defendant. Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. Pa.R.E. 401. The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. Pa.R.E. 403. Evidence will not be prohibited merely because it is harmful to the defendant. Commonwealth v. Kouma, 2012 PA Super 110, 53 A.3d 760, 770 (2012). Exclusion is limited to evidence so prejudicial that it would inflame the jury to make a decision based upon something other than the legal propositions relevant to the case. Id. The court is not required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand and form part of the history and natural development of the events and offenses for which the defendant is charged. Commonwealth v. Page, 2009 PA Super 20, 965 A.2d 1212, 1220 (2008). In Commonwealth v. Stokes, the Superior Court of

28

Pennsylvania upheld the testimony of a police detective who testified that he submitted a truthful affidavit of probable cause and then provided the affidavit of probable cause to the district attorney to ensure that the charges were correct. *See* Commonwealth v. Stokes, 2011 PA Super 261, 38 A.3d 846, 865-67 (2011). In rejecting the defendant's argument that the detective's testimony impermissibly bolstered the Commonwealth's case and was improper evidence of an arrest, the Superior Court stated that the testimony did not evade the jury's credibility determining function and the jury would still have to determine whether the evidence presented at trial was reliable. Id. at 867.

In the case at bar, defense counsel objected when Anderson was shown the protection from abuse order. Defense counsel argued that the evidence was irrelevant because it had already been identified by A.C. and that allowing Anderson to testify that he completed an affidavit of probable cause improperly bolstered the credibility of the Commonwealth's case. The Commonwealth argued that the evidence was relevant to show that Defendant was not allowed to go to the Thomas Avenue address and therefore there was probable cause to arrest Defendant for the violation of the protection order. Furthermore, the Commonwealth argued that the evidence was relevant because A.C. told Anderson that Defendant had sexually abused her during Anderson's investigation of the order, at which time Anderson transported A.C. to the Special Victims Unit and an investigation into the sexual abuse was begun. This Court permitted the Commonwealth to question Anderson about the affidavit on the basis that it was relevant to show the investigation that led to the sexual abuse charges being filed against Defendant.

As in Stokes, Anderson's testimony that he completed an affidavit of probable cause based on the evidence presented to him did not impermissibly bolster the credibility of the Commonwealth's case. Rather, the jury was still required to judge the credibility of Anderson

29

and the evidence that he relied upon in completing the affidavit of probable cause. Furthermore, the evidence was relevant to show how the investigation of Defendant progressed from a violation of a protection order to the sexual abuse charges that were the focus of his trial. Moreover, the evidence that Anderson completed an affidavit of probable cause to arrest Defendant on the violation of the protection order was not so prejudicial that it would inflame the jury to render a verdict based upon something other than the legal propositions relevant to the case, especially with regard to the separate sexual abuse charges. Thus, this Court properly allowed Anderson to testify that he completed an affidavit of probable cause against Defendant for the violation of the protection order.

## CONCLUSION

After a review of the applicable rules of evidence, statutes, case law and testimony, this Court committed no error. The evidence was sufficient to find Defendant guilty of incest and EWOC. The verdict was not against the weight of the evidence. This Court did not err in allowing the Commonwealth to introduce evidence of Defendant's prior bad acts. This Court properly allowed hearsay into evidence as there was an applicable exception. This Court did not err when it permitted the Commonwealth to introduce a statement made by Defendant without giving prior notice to defense counsel. This Court did not err when it allowed a Commonwealth witness to testify that he completed an affidavit of probable cause. Therefore, this Court's judgment of sentence should be upheld on appeal.

**BY THE COURT:**

_____ J.

31